**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

ROSA C. JOHNSON, personally and
as Personal Representative and
Administratix of the Estate of
Verlon M. Johnson, Sr., Deceased;
L.V.J., a Minor, by Rosa C.
Johnson, her Mother and Guardian;
L.Q.J., a Minor, by Rosa C.
Johnson, her Mother and Guardian;
V.M.J., a Minor, by Rosa C.
Johnson, his Mother and Guardian;
and V.J., a Minor, by Rosa C.
Johnson, his Mother and Guardian,

    Plaintiffs,

v.                       Civil Action No. 3:04cv340

THE CITY OF RICHMOND, VIRGINIA;
FORMER ACTING SERGEANT DAVID D. MELVIN,
in his Individual Capacity; DETECTIVE
WILLIAM J. BURNETT, in his Individual
Capacity; FORMER ACTING CHIEF OF POLICE
TERESA P. GOOCH, in her Individual
Capacity; CITY MANAGER CALVIN D.
JAMISON, in his Individual Capacity,

    Defendants.

**MEMORANDUM OPINION**

    This matter is before the Court on Defendant David D. Melvin's

Motion for Summary Judgment (Docket No. 67).  For the reasons set

forth below, the Motion is granted in part and denied in part.

**I.**

    On May 14, 2004, Rosa C. Johnson, wife of the decedent Verlon

Johnson, and mother of the minor children of the decedent, filed a

civil complaint against the City of Richmond, the Richmond Police

Department, Former Acting Sergeant David D. Melvin, Detective William J. Burnett, Detective Eschen Tunstall, Police Captain Carol S. Nicely, Former Acting Chief of Police Teresa P. Gooch, and City Manager Calvin D. Jamison. The Complaint consists of eight counts, six of which are asserted against Melvin.

Count I alleges a claim for assault and wrongful death against Melvin. Count II alleges a claim for battery and wrongful death against Melvin. Count III alleges a claim for gross negligence and wrongful death against Melvin.[1] Count IV alleges civil rights violations under 42 U.S.C. § 1983 for arbitrary, excessive, and unreasonable force and making decisions, establishing policies, customs, or practices related to excessive force against the City of Richmond, the Richmond Police Department, Sergeant Melvin, Police Chief Gooch, and City Manager Jamison.[2] Count V alleges intentional infliction of emotional distress by Rosa Johnson, individually, against Melvin, Nicely, and Tunstall. Count VI alleges intentional infliction of emotional distress by the Johnson children against Melvin, Nicely, and Tunstall.[3]

---

[1] Count II also asserts the same claim against Burnett in whose favor summary judgment has been awarded for reasons set forth in a separate Memorandum Opinion.

[2] The claim in Count IV against the Richmond Police Department was dismissed by Order dated November 17, 2005 (Docket No. 52). The claim in Count IV against Jamison will be dismissed on summary judgment by separate opinion.

[3] The Count granted Tunstall and Nicely's motions to dismiss, and they are no longer defendants in this case. Thus, Melvin remains the sole defendant in Counts V and VI.

Melvin was the only Defendant not to have filed a motion to dismiss (and properly so), but he now moves for summary judgment on all six counts asserted against him.

## II.

The facts must be considered in the light most favorable to the Plaintiff, according her the benefit of all reasonable inferences and resolving factual disputes in her favor.

On May 17, 2002, David D. Melvin was designated Acting Sergeant of the Richmond Police Department's Community Intelligence Team ("CIT") and the Robbery Auto Theft Task Force ("Task Force"). The City of Richmond formed the Task Force in May 2002 in response to a series of robberies in the Southside area of Richmond. Melvin was designated to head the task force by Interim Chief of Police Teresa Gooch. Also, on May 17, 2002, the City, through Jamison and Gooch, announced that it was "aggressively attacking" crime and planned to announce a public safety operation that would send a "strong message" to criminals.

On the same day, the CIT and the Task Force developed leads about an alleged robbery in the Southside area, and a suspect by the name of Bryant Terry was apprehended. Melvin assisted in a search of Terry's truck and recovered from it an assault-style rifle. The registered owner of the truck was discovered to be Verlon M. Johnson, Sr., the decedent in this case. During questioning Terry confessed that he had participated in a series of

3

robberies and claimed that Johnson was also a participant.  Terry also informed police officers that Johnson was known to carry a pistol in his pants pocket or waistband.  It appears that Melvin learned of this statement.  Based on this information, it was decided to seek arrest warrants for Terry and Johnson.

Beginning that afternoon, members of the Task Force conducted surveillance on the Johnson home.  Two men were spotted leaving the driveway of the Johnson home in a truck.  Police officers, including Burnett, stopped the truck and one of the occupants said that Johnson was in a shed behind his house cooking up crack cocaine.  He also said that Johnson's wife, children, and a friend were all inside the home.  Burnett testified that he did not recall whether the truck occupants had mentioned whether Johnson was armed, but another officer recalled that they were informed that Johnson was armed.  Defendants also have shown that Melvin announced over police radio that Johnson was "probably armed" and that he was armed "99% of the time."  According to Melvin and Burnett, both Melvin and Tunstall informed members of the Task Force that Johnson was a suspect in multiple robberies and considered armed and dangerous.

After arrest warrants were issued, six police officers, including Melvin and Burnett, approached the Johnson home, deployed around it, and proceeded to attempt to serve the arrest warrant on

Johnson.   Johnson, his wife, a friend, and the four Johnson children were all in the home at this time.

Melvin and Burnett knocked on the front door of the Johnson home and Mrs. Johnson answered the door.  The officers said that they needed to speak with her husband and asked where he was.  Mrs. Johnson said that her husband was upstairs and called to him.  At this time, Burnett stepped into the home, but Melvin remained outside.  Burnett had not anticipated having to enter the home, but realized that it was necessary to do so because the configuration of the front door and the stairs required that the front door be closed for Johnson to descend to the first floor from the stairs. Burnett told Mrs. Johnson to put the children in the front room of the home.  Burnett then told Johnson to come downstairs.

Johnson, who was unarmed, came downstairs, without a shirt on and brushing his teeth.  As Johnson descended the stairs he put his hands up to the level of his head.  Johnson closed the front door as he descended the stairs because the door was obstructing his way.  After Johnson arrived on the first floor, Burnett instructed him to go outside.  Burnett did not pat down, search, or handcuff Johnson, nor did Burnett communicate at all with Melvin at this time.

Johnson walked outside the home with his hands still raised. The parties set forth two very different versions of what transpired next.  The Plaintiff claims either that Johnson never

lowered his hands, or that, if Johnson lowered his hands at all, they were never near his pocket.  An eyewitness, Theo Brinkley, a neighbor, claims that Johnson never lowered his hands.  The Defendants claim that, contrary to Melvin's instructions, Johnson stopped walking toward Melvin and lowered his right hand toward his right hip.  Melvin claims that he perceived that Johnson's hand went into his pocket.  Melvin also claims that he instructed Johnson to remove his hand from his pocket and as Johnson removed it, Melvin perceived the hand exiting at a different angle than it had entered, which he believed indicated that Johnson had a weapon.[4]  The parties agree that at this point Melvin raised and pointed his loaded .357 caliber automatic pistol at Johnson and fired a single shot into Johnson's chest.  Johnson fell back on to the porch and died.  A subsequent search of Johnson revealed that he had no weapon.  A post-mortem blood test revealed the presence of cocaine, morphine, and a heroin metabolite in Johnson's system.

### III.

The standards of review applicable to summary judgment motions are well-established.  Summary judgment is proper only when there

---

[4]   Detective Oakes testified that Johnson reached into his pocket.  Detective Burnett testified that Johnson lowered his hands in an apparent effort to pull up his pants, but did not say that Johnson's hand went into his pocket.  The other three officers did not see if Johnson lowered his hands or not, but did hear Melvin's instructions and the shot and did not corroborate Melvin's story about what was said and the time between the instructions and the shot.

are no genuine issues as to any material facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In making this determination the Court may rely upon "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits."  Fed. R. Civ. P. 56(c).

In reviewing a motion for summary judgment, a court must view the facts and any inferences drawn from these facts in the light most favorable to the nonmoving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Nguyen v. CNA Corp., 44 F.3d 234, 236 (4th Cir. 1995).  A fact is material when proof of its existence or nonexistence would affect the outcome of the case, and an issue is genuine if a reasonable jury might return a verdict in favor of the nonmoving party on the basis of such issue.  Anderson, 477 U.S. at 248.

The nonmoving party is entitled to have her version of all that is disputed accepted, all conflicts resolved in her favor, and to have the benefit of all favorable legal theories invoked by the evidence.  M&M Medical Supplies and Serv., Inc. v. Pleasant Valley Hospital, Inc., 981 F.2d 160, 163 (4th Cir. 1992).  The party who bears the burden of proof on an issue at trial, however, cannot survive summary judgment without sufficient evidence to sustain his or her burden of proof on that point.  Celotex Corp. v. Catrett,

7

477 U.S. 317, 327 (1986).  These precepts and standards govern the resolution of Melvin's motion.

Melvin's motion presents argument on the Plaintiff's claims in the following order: Count IV; Count III; Count II; Count I; and Counts V and VI.  The brief in opposition proceeds in the same fashion.  Hence, the resolution of the motion will proceed in the same order.

### IV. Count IV: The Claim Under § 1893

Melvin first argues that Count IV fails on its substantive merits as a matter of law.  Alternatively, Melvin argues that he is entitled to qualified immunity.  Each contention will be addressed in turn.

#### A.    Count IV: The Merits

In Count IV, the Plaintiff alleges that Melvin used excessive force in effectuating the arrest and therefore violated the Fourth Amendment's guaranty against unreasonable seizures.  The claim is pressed pursuant to 42 U.S.C. § 1983 which imposes liability on any person who, under color of law, deprives another of federal constitutional rights or statutory rights.  Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266, 271 (1994) (citing Baker v. McCollan, 443 U.S. 137, 144, n.3 (1979)).  Therefore, "[t]he first step in any such claim is to identify the specific constitutional

right allegedly infringed." <u>Albright v. Oliver</u>, 510 U.S. at 271. The federal right on which the plaintiff bases the section 1983 claim in Count IV is the Fourth Amendment's guaranty of freedom from unreasonable seizures.

The Supreme Court has held that "all claims that law enforcement officers have used excessive force" in the course of a "seizure," must be "analyzed under the Fourth Amendment and its 'reasonableness' standard." <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989). The Court also held that the "reasonableness" of a particular use of force "must be judged from the perspective of the officer on the scene, rather than with the 20/20 vision of hindsight." <u>Id.</u> at 396. The Court explained that the "reasonableness" inquiry in an excessive force case "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." <u>Id.</u> at 397. Furthermore, the "calculous of reasonableness must embody allowances for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." <u>Id.</u> at 396-97.

To succeed on Count IV, the Plaintiff must establish, by a preponderance of the evidence, that: (1) Melvin engaged in conduct

which deprived Johnson of a federal constitutional right by subjecting him to an unreasonable seizure in that excessive force was used to effectuate the arrest; (2) Melvin was acting under color of state law; and (3) Melvin's conduct proximately caused the injury alleged to have been sustained, here Johnson's death.  See Jenkins v. Medford, 119 F.3d 1156, 1159-60 (4th Cir. 1997) (stating elements necessary to state a cause of action under § 1983); Leonard B. Sand et al., Modern Federal Jury Instructions, § 87.03, instructions 87-68, 87-74C (2004) (stating elements necessary to establish a § 1983 claim and those necessary to establish an excessive force claim respectively).  It is undisputed that, at the time at issue, Melvin was acting under color of state law.  And, it is undisputed that the force employed by Melvin caused Johnson's death.  Hence, the issue is whether Melvin used excessive force in effectuating the arrest.

The Fourth Circuit has held that "a police officer's use of deadly force is not excessive where he has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others."  McLenagan v. Karnes, 27 F.3d 1002, 1007-08 (4th Cir. 1994); Gray-Hopkins v. Prince George's County, 309 F.3d 224, 231 (4th Cir. 2002).  In that regard, the Court of Appeals also has held that an officer is not required to see an object in the suspect's hand before using deadly force.  Id. at 1007.  It is, therefore, permissible for an officer to fire on a suspect as a

protective measure "before directly observing a deadly weapon," when the officer has "sound reason to believe [the suspect is] armed." Anderson v. Russell, 247 F.3d 125, 131 (4th Cir. 2001). In Anderson, the Fourth Circuit explained that the fact that a suspect was actually unarmed at the time is not a determinative consequence because "the Fourth Amendment does not require omniscience . . . . Officers need not be absolutely sure . . . of the nature of the threat or the suspect's intent to cause them harm–the Constitution does not require that certitude precede the act of self protection." Id. at 132 (quoting Elliott v. Leavitt, 99 F.3d 640, 644 (4th Cir. 1996)).

Melvin argues that the use of deadly force was reasonable here because Melvin had information that Johnson was known to carry a gun in his waistband or pocket; Johnson disobeyed Melvin's command to keep his hands up; and Melvin perceived that Johnson reached into his pocket and removed his hand "in a different form than it was when it into" the pocket.  If those facts were not in dispute, the argument would be well-taken.  However, the Plaintiff disputes Melvin's version of the fact.  More to the point, the Plaintiff has presented evidence from which a jury reasonably could find that Johnson's arms remained raised the entire time, or that if they were lowered at all, that Johnson did not reach into his pocket. In either event, the jury could find that it was objectively unreasonable for Melvin to use deadly force.  The issue of the

11

disputed facts is thoroughly developed in the Court's qualified immunity analysis below.  In that analysis, the Court concludes that the material facts remain genuinely in dispute, and therefore summary judgment on the issue of excessive force is inappropriate.

### B.  Count IV: Qualified Immunity

Melvin argues that he is entitled to qualified immunity because the facts fail to establish that Melvin violated Johnson's Fourth Amendment right.  Additionally, Melvin argues that Johnson's right to be free from the application of deadly force, under the facts of this case, was not clearly established at the time of the shooting.

In evaluating a claim of qualified immunity, it is necessary to determine whether the facts, taken in the light most favorable to the party asserting the injury, "allegedly show that the officer's conduct violated a constitutional right."  Saucier v. Katz, 533 U.S. 194, 201 (2001).  If such a violation could be made out, the second step is "to ask whether the right was clearly established."  Id.  To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right."  Id. at 202 (quoting Anderson v. Creighton, 482 U.S. 635, 640 (1987)).

Government officials, such as police officers, are entitled to qualified immunity "to the extent that their conduct does not violate clearly established statutory or constitutional rights of

12

which a reasonable person would have known." Harlow v. Fitzgerald, 547 U.S. 800, 818 (1982); Kirby v. City of Elizabeth City, 380 F.3d 777, 787 (4th Cir. 2004).  Officers are not afforded protection when they are "plainly incompetent or . . . knowingly violate the law." Rogers v. Pendleton, 249 F.3d 279, 286 (4th Cir. 2001) (quoting Malley v. Briggs, 472 U.S. 335, 341 (1986)).  When the right is not clearly established, officials cannot be held liable for "bad guesses in a gray area." Kirby, 380 F.3d at 737 (quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992)).

These principles guide analysis of the qualified immunity issue.  Each will be examined in turn based on the record in this action.

### 1.    Violation of Constitutional Right

The first step in the qualified immunity analysis is to determine whether, taken in the light most favorable to the Plaintiff, Melvin's conduct violated Johnson's constitutional rights.  The constitutional right alleged by Johnson is the Fourth Amendment right to be free from an unreasonable seizure in the form of the use of deadly force in the making of an arrest.

Melvin does not dispute that the use of deadly force in effecting an arrest constitutes a "seizure" to which a person's Fourth Amendment rights attach.  Moreover, the Supreme Court has held that "[t]he intrusiveness of a seizure by means of deadly force is unmatched." Tennessee v. Garner, 471 U.S. 1, 9 (1985).

Melvin instead argues that his conduct "amounts to nothing more than a decision, made under extreme conditions, to fire upon a suspect whom he reasonably, albeit incorrectly, believed to be armed and threatening." Mem. in Supp. of Def. David D. Melvin's Mot. for Summ. J. at 27 ("Melvin's Mem.").

Melvin is correct that police officers are entitled to qualified immunity for making reasonable decisions because such decisions, even if wrong, do not amount to a constitutional violation. The Fourth Circuit has held that, in cases where the plaintiff has alleged an unconstitutional use of deadly force in evaluating a claim for qualified immunity, "the officer's actions are judged on a standard of objective reasonableness." Sigman v. Town of Chapel Hill, 161 F.3d 782, 786-87 (4th Cir. 1998). Thus the court must consider "what a reasonable officer on the scene would have done." Id. at 787.

Both parties agree that, if Johnson was shot with his hands in the air, summary judgment is inappropriate. The issue thus comes down to whether there is a genuine dispute of material fact respecting whether Johnson kept his hands raised, and if he did lower them, whether their positioning indicated that he might be reaching for a weapon. As explained below, there are material facts in dispute as to the positioning of Johnson's arms and hands when Melvin shot him and those disputes preclude summary judgment on the issue whether Johnson's constitutional rights were violated.

14

Plaintiffs do not contest that, if Melvin had a reasonable belief that Johnson was reaching for a weapon, Melvin would be entitled to use deadly force and also entitled to qualified immunity.  However, the Plaintiff contends that there remains a material dispute about this key issue, namely, whether Johnson moved his arms or hands in such a way that would indicate to a reasonable officer that he might be reaching for a weapon.  And, on that score, the Plaintiff is right.

The Fourth Circuit has explained that, when conducting a qualified immunity analysis, the "determination of what an officer did may require the resolution of disputed factual allegations by the trier of fact."  Buonocore v. Harris, 65 F.3d 347, 359 (4th Cir. 1995).  Explaining that disputed facts "are treated no differently in this portion of the qualified immunity analysis than in any other context," the Court of Appeals held that if the plaintiff has alleged a clearly established right, "summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants."  Id. at 359-60.  Put another way, the Fourth Circuit has made clear that "[w]hen resolution of a case depends on determining what actually happened, 'the issue is inappropriate for resolution by summary judgment.'"  Vathekan v. Prince George's County, 154 F.3d 173, 179-80 (4th Cir. 1998).

Nevertheless, the mere presence of disputed material facts is not enough to foreclose the possibility of summary judgment on qualified immunity grounds. The purpose of qualified immunity is to "spare individual officers the burdens and uncertainties of standing trial in those instances where their conduct would strike an objective observer as falling within the range of reasonable judgment." Gooden v. Howard County, 954 F.2d 960, 965 (4th Cir. 1992). In Gooden the Court of Appeals held that, notwithstanding varying accounts by witnesses as to what precisely transpired on the evening at issue, the officers were nevertheless entitled to qualified immunity. The court held that it was "aware of no evidence . . . that the officers' mistaken perception–if it was in fact mistaken–was unreasonable." Id. Thus, the court concluded that "[i]n the absence of a genuine dispute as to the reasonableness of the officers' perceptions, the issue of qualified immunity is ripe for summary judgment." Id. at 965-66.

The Plaintiff has cited to a number of Fourth Circuit decisions in which the Court of Appeals has held that it is not reasonable for a police officer to shoot a suspect with his hands in the air and the law on this issue is perfectly clear. In Gray-Hopkins v. Prince George's County, 309 F.3d 224 (4th Cir. 2002), the Fourth Circuit reviewed a motion for summary judgment on qualified immunity grounds on a claim of excessive force by a police officer.

16

After reiterating the precept that deadly force "is justified only where a reasonable officer would have sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others," id. at 231 (citing Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996)), the Court of Appeals concluded that, based on the plaintiff's version of the facts, which was supported by competent evidence, the suspect was standing still with his hands raised over his head at the time of the fatal shot and was not posing a threat to the safety of the officers or others.  Id.  Thereupon, the court held that "a trier of fact could clearly conclude that a Fourth Amendment violation occurred and that a reasonable officer . . . could not have believed he was acting lawfully."  Id.

Melvin relies heavily upon Sigman for his contention that conflicting testimony does not necessarily foreclose a determination of qualified immunity.  In Sigman, officers responded to a domestic disturbance call.  Sigman, 161 F.3d at 784.  When officers arrived on the scene Sigman's girlfriend informed them that Sigman was inside the house and out of control.  Id.  Later, she informed the officers that Sigman had a knife.  Id.  The officers knocked on the front door and spoke to Sigman who threatened to harm them and then proceeded to break a window.  Id.  The officers attempted to calm Sigman down and Sigman responded with obscenities, threatened to kill the officers, and reached

through the window with his knife, swinging it at the officers. Id. at 784-85. Sigman eventually exited the home, and according to all of the officers on the scene, he held a knife in his hand. Id. at 785. Sigman ignored orders by the officers to drop the knife, continued to threaten them, and advanced toward them. Id. When Sigman got within ten to fifteen feet from the officers and still refused to stop, the officers fired on him, and Sigman was mortally wounded. Id. The knife was recovered on the ground beside Sigman.

The plaintiffs in Sigman contended that there was a genuine issue of material fact based upon the affidavits of three witnesses. The plaintiffs argued that the affidavits created a factual dispute as to whether Sigman actually had a knife when he was shot, whether the perception that Sigman had a knife was reasonable, and whether Sigman was a threat to the officers when he was shot. Id. at 786.

The Court of Appeals concluded that the affidavits did not create a factual dispute with respect to the issue of qualified immunity. Id. In so holding, the court noted that it was "undisputed that, at the moment Sigman stepped out of the house, [the officer] had ample knowledge of Sigman's dangerousness," adding that the officer knew that Sigman was enraged, that he had been drinking, that he made threats on his own life and the life of the officers, and that he had a knife and was willing to use it. Id. at 787. The court also explained that "all of the officers at

18

the scene, perceived that Sigman was holding a knife as he moved forward towards [the officer]." Id. The three witnesses, whose affidavits were asserted to create the genuinely disputed material fact, were standing amidst a crowd that was cheering and taunting Sigman to continue. The Fourth Circuit found that their "observations cannot effectively impact the credibility of [the officer's] testimony (or that of all five other officers on the scene) as to his perceptions of what he saw from an entirely different-and closer-vantage point, especially when [the officer] had special knowledge of Sigman's dangerousness and of the threats that Sigman had made on his life." Id. at 788.

The facts in this record are significantly different than those in Sigman. Even assuming that Melvin knew that Johnson was known to carry a weapon, the record here contains credible evidence that Johnson's actions at the scene did not indicate that he presented a danger to Melvin. In Sigman, there was no question that the suspect presented a present danger to the officers because he was threatening the officers and brandishing a knife. Here, while there was a possibility that Johnson may have been armed, there is evidence that he was compliant and calm as he exited the house. And, there is certainly no evidence that Johnson threatened the officers or brandished a weapon at any time.

Furthermore, not all of the officers on the scene corroborated Melvin's version of the facts. One of the other officers

testified that Johnson put his hand in his pocket.   However, Burnett, who was closest to Johnson, testified that, while Johnson put one hand down, it did not appear to enter the pocket.   The other officers did not testify that Johnson put his hands down at all, although some of them did not have a clear view of the scene. Additionally, there is a witness, Brinkley, who directly contradicted Melvin's version of the facts.   And, Brinkley's view was not impaired, as was the perspective of the witnesses in Sigman.   Thus, the contradictory testimony of Brinkley and the other officers creates a genuine issue on the material fact as to the positioning of Johnson's hands at the time of the shooting.

On this record and considering the precedent in this circuit, the material facts are genuinely in dispute and the resolution of those material facts are key to the issues of Melvin's perceptions and the reasonableness of his conduct in resorting to lethal force. Accordingly, the record here forecloses a finding favorable to Melvin on the first facet of the qualified immunity analysis.

### 2.   Was the Right Clearly Established?

The next step in the qualified immunity analysis is to consider whether the right at issue was "clearly established" at the time of the violation.   Saucier, 533 U.S. at 201.   In resolving whether a right was "clearly established," it is necessary to define the allegedly violated right "at a high level of particularity."   Wilson v. Kittoe, 337 F.3d 392, 403 (4th Cir.

2003).   Thus,  while  the  right  to  be  free  from  unreasonable
seizures,  including  the  unreasonable  use  of  deadly  force,  is
clearly  established,  the  right  cannot  be  defined  at  such  a  general
level.

Plaintiffs  argue  that  it  is  clearly  established  that  an
officer  must  have  probable  cause  to  believe  that  the  suspect  poses
a  threat  before  shooting  him.   Pls.' Opp'n  to  Def.  David  Melvin's
Mot.  for  Summ.  J.  at  26.   There  can  be  no  doubt  that  shooting  a
suspect  with  his  arms  raised,  or  that  shooting  a  suspect  who  does
not  appear  to  pose  a  threat,  constitutes  the  violation  of  a  clearly
established  right.   For  example,  in  McLenagan,  the  Fourth  Circuit
explained  that  the  "clearly  established  right  at  the  time  of  the
encounter . . . was  that  a  police  officer's  use  of  deadly  force  is
not  excessive  where  he  has  probable  cause  to  believe  that  a  suspect
poses  a  threat  of  serious  physical  harm  to  the  officer  or  others."
McLenagan,  27  F.3d  1002,  1006-07  (citing  Tennessee v. Garner,  471
U.S.  at  11  (1985)).   To  assess  whether  probable  cause  existed,  the
court  must  consider  "the  particular  circumstances  confronting  the
official  at  the  time  of  the  questioned  action."   Id.  at  1007
(quoting  Slattery v. Rizzo,  939  F.3d  213,  216  (4th  Cir.  1991)).
The  officer  may  be  entitled  to  qualified  immunity  "[r]egardless  of
whether  probable  cause  actually  existed,  if  a  reasonable  officer
possessing  the  same  particularized  information . . . could  have,  in
light  of  Garner,  believed  that  his  conduct  was  lawful."   Id.

Melvin cites to <u>Anderson v. Russell</u> in support of the proposition that Melvin had probable cause to use deadly force. While Melvin claims that this case presents an "almost identical situation," <u>Anderson</u> is materially different than this case.  In <u>Anderson</u>, the court held that the "evidence conclusively establishes that [the officer] reasonably believed [the suspect] to be armed with a gun." <u>Anderson</u>, 247 F.3d at 130.  This "reasonable" belief was based upon "a citizen's report that was later corroborated by [the officer's] own observation of a bulge near [the suspect's] waistband." <u>Id.</u>  Here, there is evidence that Melvin had been informed that Johnson often carried a weapon, however, the record does not establish that Melvin actually saw reliable evidence that Johnson possessed a gun at the time.

Also, in <u>Anderson</u> there was a witness who claimed that the suspect was lowering his hands at a much slower rate than the officer claimed to be the case.  The court found that this testimony did not preclude a finding that the officer's use of deadly force was reasonable, because the witness was much further away and had a worse vantage point. <u>Id.</u> at 130.  Thus, the court held that "minor discrepancies in testimony do not create a material issue of fact in an excessive force claim, particularly when, as here, the witness is typically viewing the event from a worse vantage point than that of the officers." <u>Id.</u> at 131. Again, the facts in this case are different.  There was a witness,

Brinkley, who claimed that Johnson never lowered his hands at all, which is more than a "minor discrepancy." While this witness was clearly further away from Johnson than was Melvin, the record does not establish that the vantage point of the witness was a poor one. Additionally, only one of the other officers, Officer Oakes, directly corroborated Melvin's story. See Pls.' Opp. to Def. David D. Melvin's Mot. for Summ. J. at 10.

The right not to be shot while surrendering with one's hands in the air, or otherwise not posing a danger to the arresting officer, was clearly established at the time here in issue. Tennessee v. Garner, 471 U.S. at 9; McLenagan v. Karnes, 27 F.3d at 1006-1007. If the jury concludes that Melvin had no basis to believe that Johnson posed a threat, and a reasonable jury could so conclude, Melvin violated that right when he shot Johnson. On this record, and under settled law, summary judgment cannot be awarded.

## V. The Wrongful Death Claim: Gross Negligence

In Count III, the Plaintiff asserts a claim for wrongful death. Under Virginia law, a Government agent, such as Melvin, performing an essential governmental function that calls for the exercise of discretion, such as executing an arrest warrant, is obligated to exercise reasonable care for the safety of others. However, a Government agent, including Melvin, is entitled to protection under Virginia's precepts of sovereign immunity from liability for negligence in the exercise of the governmental

function.   Of course, sovereign immunity does not protect an officer who acts in a grossly negligent fashion in the discharge of the discretionary governmental function.  <u>Veney v. Ojeda</u>, 321 F. Supp.2d 733, 747 (E.D. Va. 2004); <u>Colby v. Boyden</u>, 241 Va. 125, 128-30, 400 S.E.2d 184, 186-87 (1991); <u>James v. Jane</u>, 221 Va. 43, 53, 282 S.E.2d 864, 869 (1980).

The parties agree that gross negligence is defined to be "utter disregard of prudence amounting to complete neglect of the safety of another." <u>Frazier v. City of Norfolk</u>, 234 Va. 388, 393, 362 S.E.2d 688, 691 (1987).  In other words, gross negligence is "the absence of slight diligence, or the want of even scant care." <u>Id.</u>  The degree of negligence involved is such as "will shock fair minded men although something less than willful recklessness." <u>Ferguson v. Ferguson</u>, 212 Va. 86, 92, 181 S.E.2d 648, 653 (1971).

Thus, to recover on Count III, the Plaintiff must establish that, in shooting Johnson, Melvin acted in utter disregard for the safety of others, exercising not even slight diligence or evincing the want of even scant care.  Ordinarily, gross negligence is to be measured by an objective standard and thus whether there is gross negligence is "generally a factual matter for resolution by the jury and becomes a question of law only when reasonable people cannot differ." <u>Koffman v. Garnett</u>, 265 Va. 12, 15, 574 S.E.2d 258, 260 (2003); <u>Brown v. Mitchell</u>, 327 F. Supp. 2d 615, 647 (E.D. Va. 2004).

24

Melvin argues that Count III fails because Melvin was justified in firing his weapon based on a perception that Johnson posed a substantial threat of death or severe bodily injury to Melvin and other officers.  This, says Melvin, forecloses the finding of gross negligence that is essential to success in Count III.  Additionally, Melvin argues that, at a minimum, the undisputed facts establish that Melvin exercised some degree of care in attempting to bring Johnson into custody.

The Fourth Circuit, applying Virginia law, has held that a police officer, after having been told that someone "has got a gun!", who shot an unarmed arrestee who was running toward him, was not acting with gross negligence.  McLenagan, 27 F.3d at 1009.  The police officer, after receiving the admonition "he's got a gun," spotted McLenagan, who had been detained on suspicion of driving while intoxicated, running down a hallway.  Because McLenagan was handcuffed and crouched over, the officer incorrectly believed McLenagan to be the suspect who had possession of a gun and shot him as he approached.  Id. at 1005.  Defendants rely exclusively on McLenagan in support of their argument and assert that "McLenagan establishes that Melvin's decision to fire under these circumstances does not constitute gross negligence."  Melvin Mem. at 33.  The court resolved McLenagan by holding that "Karnes's conduct did not amount to complete neglect of McLenagan's safety;

he was simply faced with an impossible choice that had to be made in the flickering of an instant." McLenagan, 27 F.3d at 1009.

While McLenagan does involve a police officer shooting an unarmed suspect, none of the other facts are remotely similar to those in this case. Defendants argue that Melvin too had to act in the "flickering of an instant." There are, however, crucial differences in the facts of these two cases. In McLenagan, the officer knew that someone had a gun, and the situation was one for which the officers were wholly unprepared because they were working at a sobriety checkpoint and thus the chance that such a situation would present itself was extremely slim. Furthermore, Karnes saw the defendant approaching him quickly and could not be sure if he had the gun on him or not; thus he had to act instantaneously, lest his life or someone else's be in immediate danger.

In this case, Melvin and the other officers orchestrated an arrest that, according to Melvin, involved significant preparation. Also, according to Melvin, Johnson was known to often have a weapon on him, thus Melvin had advance knowledge of the possibility that Johnson might be armed. This is very different from the situation in McLenagan where the incident at issue was entirely unanticipated. Having been aware of this possibility, Melvin decided to effectuate the arrest in a manner that called for Johnson to approach Melvin. He, therefore, was not surprised by Johnson's approach.

26

Most significantly, of course, there are disputed facts as to whether Johnson ever lowered his hands, and even if he did, whether or not he placed his hand in his pocket.  All of these issues arise from material facts, which remain in dispute, and which, if resolved against Melvin, could lead a reasonable jury to conclude that Melvin acted with gross negligence.

## VI. Count II: Battery

In Count II, the Plaintiff asserts that Melvin committed the common law tort of battery: "By shooting Mr. Johnson, Defendant Melvin committed an unwanted touching to which Mr. Johnson did not consent.  Defendant Melvin had no legal justification or excuse for committing this wrongful act."  Compl. ¶ 64.  The Plaintiff further asserts that "[a]s a direct and proximate result of the conduct and actions of Defendant Melvin, Mr. Johnson suffered the injury of death."  Compl. ¶ 65.  Melvin argues that, because he was justified in discharging his weapon to protect his life and the lives of other officers, the Plaintiff's claim for battery is legally barred.  Under Virginia law, the tort of battery is "an unwanted touching which is neither consented to, excused, nor justified." Koffman v. Garnett, 574 S.E.2d 258, 261 (Va. 2003).  The Fourth Circuit has held that recovery under Section 1983 for excessive force may in fact necessitate a recovery on state law claims for assault and battery.  See Carter v. Rogers, 805 F.2d 1153, 1158 (4th Cir. 1986).  Thus, because of the issue of whether or not the

use of force in this case was excessive remains unresolved and the facts surrounding it remain disputed, the claim for battery cannot be resolved on summary judgment.

### VII. Count I: Assault

In Count I, the Plaintiff asserts a claim for the common law tort of assault, claiming that "Defendant Melvin shot Mr. Johnson with the intent to cause harmful contact with Mr. Johnson, which created in Mr. Johnson's mind a reasonable apprehension of imminent contact" and that "Melvin had no legal justification or excuse for committing this wrongful act."  Compl. ¶ 60.  Melvin also argues that the claim for assault must fail because the Plaintiff cannot provide any evidence proving that Johnson was scared before he was struck by the bullet.  This is a frivolous argument.  Under Virginia law, the tort of assault "consists of an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an immediate battery." Koffman v. Garnett, 574 S.E.2d 258, 261 (Va. 2003).  To establish the tort of assault, therefore, the plaintiff must prove that the defendant "performed an act intended to cause either harmful or offensive contact," that created in the person's mind "a reasonable apprehension of an imminent battery."  Etherton v. Doe, 597 S.E.2d 87, 89 (Va. 2004).

It is true that Plaintiffs cannot "prove" that Johnson was scared, but the record permits a reasonable inference that Johnson was called out of his home and was surrounded by law enforcement officers.  Melvin had his gun pointed directly at Johnson.  Any reasonable person would have apprehended a battery under these circumstances.

### VIII. Counts V and VI: Intentional Infliction of Emotional Distress

In Counts V and VI, the Complaint asserts claims for intentional infliction of emotional distress on behalf of Mrs. Johnson and the Johnson Children.  Count V states that Melvin "committed the common law tort of intentional infliction of emotional distress by intentionally shooting and killing Mr. Johnson while his wife was nearby."  Compl. ¶ 77.  Count VI states that Melvin "committed the common law tort of intentional infliction of emotional distress by intentionally causing the death of Mr. Johnson while the Children were nearby."  Compl. ¶ 82.

Under Virginia law, a cause of action for intentional infliction of emotional distress will lie if four elements are met:

> One, the wrongdoer's conduct was intentional or reckless. . . . Two, the conduct was so outrageous and intolerable in that it offends against the generally accepted standards of decency and morality. . . . Three, there was a causal connection between the wrongdoer's conduct and the emotional distress. Four, the emotional distress was severe.

<u>Womack v. Eldridge</u>, 210 S.E.2d 145, 148 (Va. 1974).  Claims for intentional infliction of emotional distress where there is no physical injury alleged are "not favored" in Virginia.  <u>Ruth v. Fletcher</u>, 377 S.E.2d 412, 415 (Va. 1989).  In <u>Ruth</u>, the Supreme Court of Virginia explained that, "because of the fact that fright or mental shock may be so easily feigned without detection, the court should allow no recovery in a doubtful case." <u>Id.</u> at 415-16.

A court's consideration of a motion for summary judgment for failure to allege intentional infliction of emotional distress should thus begin with the second element because "outrageousness is a question of law for the court, and only becomes a jury question if reasonable persons could disagree." <u>Womack</u>, 210 S.E.2d at 148.  The outrageous conduct "must go beyond all possible bounds of decency, and be regarded as atrocious and utterly intolerable in a civilized community." <u>Gordon v. Gestetner Corp.</u>, 1003 WL 198191, at *2 (4th Cir. 1993) (unpublished) (citing <u>Russo v. White</u>, 400 S.E.2d 160, 162 (Va. 1991)).

Melvin argues that the Plaintiff "cannot establish that Detective Melvin's conduct was tortious or criminal, let alone that it surpassed 'all possible bounds of decency.'" Melvin's Mem. at 38.  Again, Melvin bases his argument on his version of the facts, which are disputed, and his conclusory contention that his use of deadly force was reasonable.  As noted above, summary judgment on the issue of excessive force is not proper where reasonable minds

could differ.  Because of the disputed facts, reasonable minds could also differ as to whether Melvin's conduct was outrageous. Clearly, shooting an unarmed and compliant suspect is outrageous and intolerable; and, therefore, if one believes the Plaintiff's factual allegations, a reasonable person could conclude that Melvin's conduct was outrageous.

Melvin also argues that the Plaintiff has failed to establish "severe emotional distress" under either Count V or Count VI. Intentional infliction of emotional distress is "not favored," and therefore Virginia courts have crafted a stringent standard for the plaintiff to meet in order to weed out frivolous claims.  The court in Russo explained that:

> The term "emotional distress" travels under many labels, such as "mental suffering, mental anguish, mental or nervous shock . . . . It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea." Restatement comment j.  But, liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it.

Russo, 400 S.E.2d at 163.

Russo has become the controlling test for severity in Virginia.  In that case the plaintiff claimed that she was "nervous, could not sleep, experienced stress and 'its physical symptoms,' withdrew from activities, and was unable to concentrate on work."  Russo, 400 S.E.2d at 163.  The Supreme Court of Virginia

31

held that these symptoms did not rise to the level of severity necessary to recover for intentional infliction of emotional distress, noting in dicta that the plaintiff did not claim "any objective physical injury caused by the stress, [nor did she claim] that she sought medical attention, that she was confined at home or in a hospital, or that she lost income." Id.

Subsequent cases have held that, without an objective physical injury, medical attention, confinement at home or in a hospital, or lost wages, as set forth in Russo, a plaintiff cannot satisfy the severity requirement. For example, a plaintiff claiming that she was "nervous, could not sleep, experienced stress and its physical symptoms, withdrew from activities, and could not concentrate at work," was found not to have alleged the level of severity necessary to sustain a claim for intentional infliction of emotional distress. Morrissey v. Jennings, 60 Va. Cir. 179 (Va. Cir. Ct. 2002). Similarly, suffering from "many nightmares and terrible memories" after witnessing the death of a child does not rise to the level of severity required by Russo. Umbel v. Crider, 50 Va. Cir. 352 (Va. Cir. Ct. 1999). Nor does "severe headaches, loss of appetite, insomnia, nausea, and crying fits." S.R. v. Inova Healthcare Servs., 49 Va. Cir. 119 (Va. Cir. Ct. 1999). However, where a plaintiff alleged that she suffered from "stress, anxiety, sleeplessness, nervousness, and depression" and claimed that she "sought medical attention and psychological counseling,"

32

the severity requirement was found to be satisfied. <u>Almy v. Grisham</u>, 55 Va. Cir. 401 (Va. Cir. Ct. 2001). The requirement is also satisfied where the plaintiff was required to "seek emergency treatment" and was "placed on medications." <u>Allen v. Seventy-Seven Acres</u>, 48 Va. Cir. 318 (Va. Cir. Ct. 1999).

Plaintiffs base their claim for intentional infliction of emotional distress upon the report of Dr. Camille Wortman, a psychologist and the Plaintiff's psychiatric expert on grieving. There is no evidence that Mrs. Johnson or the Johnson children sought any medical treatment before filing this action. This casts serious doubt on the assertion of severe injury.

Additionally, the symptoms alleged by Mrs. Johnson and the Johnson children simply do not meet the definition for "severe" in this rubric of Virginia law. The Johnson children complain of sleep disturbances, nightmares, severe headaches, severe stomach aches, significant weight gain, somatization, obsessive-compulsiveness, interpersonal sensitivity, depression, anxiety, hostility, and decreased academic functioning. Virginia courts have held that "mental anguish, mental suffering, disappointment, worry, anger and even nausea, while harbingers of emotional distress, do not rise to the level of severity necessary to support a claim for intentional infliction of emotional distress." <u>S.R. v. Inova Healthcare Servs.</u>, 49 Va. Cir. 119; <u>see</u> <u>also</u> <u>Morrissey v. Jennings</u>, 60 Va. Cir. 179 (holding that nervousness, stress,

33

insomnia, and lack of concentration do not meet the requisite level of severity).  All of the Johnson children's claims fall into this category.

The only symptoms that come close to the level of severity required by Virginia law are those alleged by Mrs. Johnson, but her claim must fail too.  Mrs. Johnson claims that she was hospitalized with an inflamed pancreas and the doctor said that it was probably caused by stress.  The causal connection here is far too attenuated to reach the high standard of severe injury required to support a claim for intentional infliction of emotional distress.  Thus, summary judgment is proper on Counts V and VI.

## CONCLUSION

For the foregoing reasons, Melvin's motion for summary judgment is denied as to Counts I, II, III, and IV and is granted as to Counts V and VI.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.


_____/s/_____
Robert E. Payne
United States District Judge

Richmond, Virginia
Date:_____

34