IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ROSA C. JOHNSON, personally and
as Personal Representative and
Administratix of the Estate of
Verlon M. Johnson, Sr., Deceased;
L.V.J., a Minor, by Rosa C.
Johnson, her Mother and Guardian;
L.Q.J., a Minor, by Rosa C.
Johnson, her Mother and Guardian;
V.M.J., a Minor, by Rosa C.
Johnson, his Mother and Guardian;
and V.J., a Minor, by Rosa C.
Johnson, his Mother and Guardian,

    Plaintiffs,

v.                                              Civil Action No. 3:04cv340

THE CITY OF RICHMOND, VIRGINIA;
FORMER ACTING SERGEANT DAVID D. MELVIN,
in his Individual Capacity; DETECTIVE
WILLIAM J. BURNETT, in his Individual
Capacity; FORMER ACTING CHIEF OF POLICE
TERESA P. GOOCH, in her Individual
Capacity; CITY MANAGER CALVIN D.
JAMISON, in his Individual Capacity,

    Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on Defendant Calvin P. Jamison's Motion for Summary Judgment (Docket No. 71). For the reasons set forth below, the motion is granted.

**I.**

On May 14, 2004, Rosa C. Johnson, wife of the decedent Verlon Johnson, and mother of the minor children of the decedent, filed a civil complaint against the City of Richmond, the Richmond Police

Department, Former Acting Sergeant David D. Melvin, Detective William J. Burnett, Detective Eschen Tunstall, Police Captain Carol S. Nicely, Former Acting Chief of Police Teresa P. Gooch, and City Manager Calvin D. Jamison. The Complaint consists of eight counts.

Count IV of the Complaint alleges a claim under 42 U.S.C. § 1983 against Jamison. The Court previously granted a motion to dismiss the § 1983 claim in Count IV against Jamison in his official capacity. Therefore, the remaining aspect of the claim against Jamison in Count IV is the § 1983 claim in his individual capacity.

Jamison has now moved for summary judgment under Fed. R. Civ. P. 56. Jamison contends that summary judgment is proper because: (1) Melvin did not violate Johnson's Fourth Amendment rights; (2) Jamison was not a "supervisor" and did not act with "deliberate indifference;" and (3) Jamison is entitled to qualified immunity.

**II.**

The facts must be considered in the light most favorable to the Plaintiff, according her the benefit of all reasonable inferences and resolving factual disputes in her favor. The facts are thusly presented below.

On May 17, 2002, David D. Melvin was designated Acting Sergeant of the Richmond Police Department's Community Intelligence Team ("CIT") and the Robbery Auto Theft Task Force ("Task Force"). The City of Richmond formed the Task Force in May 2002 in response

to a series of robberies in the Southside area of Richmond. Melvin was designated to head the Task Force by Interim Chief of Police Teresa Gooch. Also, on May 17, 2002, the City, through Jamison and Gooch, announced that it was "aggressively attacking" crime and planned to announce a public safety operation that would send a "strong message" to criminals.

On the same day, the CIT and the Task Force developed leads about an alleged robbery in the Southside area, and a suspect by the name of Bryant Terry was apprehended. Melvin assisted in a search of Terry's truck and recovered an assault-style rifle from it. The registered owner of the truck was discovered to be Verlon M. Johnson, Sr., the decedent in this case. During questioning Terry confessed that he had participated in a series of robberies and claimed that Johnson was also a participant. Terry also informed police officers that Johnson was known to carry a pistol in his pants pocket or waistband. Based on this information, it was decided to seek arrest warrants for Terry and Johnson.

Beginning that afternoon members of the Task Force conducted surveillance on the Johnson home. According to the defendants, two men were spotted leaving the driveway of the Johnson home in a truck. The truck was stopped and one of the occupants said that Johnson was in a shed behind his house cooking crack cocaine. He also said that Johnson's wife, children, and a friend were inside the home.

3

Detective Burnett testified that he did not recall whether the truck occupants had mentioned whether Johnson was armed, but another officer recalled that they were informed that Johnson was armed. Defendants also have shown that Melvin announced over police radio that Johnson was "probably armed" and that he was armed "99% of the time." According to Melvin and Burnett, both Melvin and Tunstall informed members of the Task Force that Johnson was a suspect in multiple robberies and was considered armed and dangerous.

After arrest warrants were issued, six police officers, including Melvin and Burnett, approached the Johnson home, deployed around it, and proceeded to serve the arrest warrant on Johnson. Johnson, his wife, a friend, and the four Johnson children were all in the home at this time.

Melvin and Burnett knocked on the front door of the Johnson home and Mrs. Johnson answered the door. The officers said that they needed to speak with her husband and asked where he was. Mrs. Johnson said that her husband was upstairs and called to him. At this time Burnett stepped into the home, but Melvin remained outside. Burnett had not anticipated having to enter the home, but realized that it was necessary to do so because the configuration of the front door and the stairs required that the front door be closed for Johnson to descend to the first floor from the stairs.

Burnett told Mrs. Johnson to put the children in the front room of the home. Burnett then told Johnson to come downstairs.

Johnson, who was unarmed, descended the stairs while brushing his teeth. As Johnson descended, he put his hands up to the level of his head. Johnson closed the front door as he descended the stairs because the door was obstructing his way. After Johnson arrived on the first floor, Burnett instructed him to go outside. Burnett did not pat down, search, or handcuff Johnson, nor did Burnett communicate at all with Melvin at this time.

Johnson walked outside the home with his hands still raised. The parties set forth two very different versions of what transpired next. The Plaintiff claims either that Johnson never lowered his hands, or that, if Johnson lowered his hands at all, they were never near his pocket. An eyewitness, Theo Brinkley, a neighbor, claims that Johnson never lowered his hands. The Defendants claim that, contrary to Melvin's instructions, Johnson stopped walking toward Melvin and lowered his right hand toward his right hip. Melvin claims that he perceived that Johnson's hand went into his pocket. Melvin also claims that he instructed Johnson to remove his hand from his pocket and, as Johnson complied with that request, Melvin perceived the hand exiting at a different angle than it had entered, which he believed indicated that Johnson

5

had a weapon.[1] The parties agree that, at this point, Melvin raised and pointed his loaded .357 caliber automatic pistol at Johnson and fired a single shot into Johnson's chest. Johnson fell back on to the porch and died. A subsequent search of Johnson revealed that he had no weapon. A post-mortem blood test revealed the presence of cocaine, morphine, and a heroin metabolite in Johnson's system.

### III.

The standards of review applicable to summary judgment motions are well-established. Summary judgment is proper only when there are no genuine issues as to any material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In making this determination the Court may rely upon "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed. R. Civ. P. 56(c).

In reviewing a motion for summary judgment, a court must view the facts and any inferences drawn from these facts in the light most favorable to the nonmoving party. See Matsushita Elec. Indus.

---

[1] Detective Oakes testified that Johnson reached into his pocket. Detective Burnett testified that Johnson lowered his hands in an apparent effort to pull up his pants, but did not say that Johnson's hand went into his pocket. The other three officers did not see if Johnson lowered his hands or not, but did hear Melvin's instructions and the shot and did not corroborate Melvin's story about what was said and the time between the instructions and the shot.

6

Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Nguyen v. CNA Corp., 44 F.3d 234, 236 (4th Cir. 1995). A fact is material when proof of its existence or nonexistence would affect the outcome of the case, and an issue is genuine if a reasonable jury might return a verdict in favor of the nonmoving party on the basis of such issue. Anderson, 477 U.S. at 248.

The nonmoving party is entitled to have her version of all that is disputed accepted, all conflicts resolved in her favor, and to have the benefit of all favorable legal theories invoked by the evidence. M&M Med. Supplies and Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 163 (4th Cir. 1992). The party who bears the burden of proof on an issue at trial, however, cannot survive summary judgment without sufficient evidence to sustain his or her burden of proof on that point. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). These precepts and standards govern the resolution of Jamison's motion.

**IV.**

In Count IV of the Complaint, the Plaintiff asserts that: (1) Jamison was responsible for failing to train the Richmond Police Department's officers in the proper use of force; (2) Jamison maintained a policy of encouraging officers to use excessive force by failing to investigate excessive force claims against officers and by failing to take corrective action in response to these incidents; and (3) Jamison tacitly approved the allegedly improper

7

assignment of Melvin to the Robbery Auto Theft Task Force.  All of the conduct is asserted to be in violation of the Fourth Amendment, as a species of an unlawful use of force claim.  The Plaintiff seeks, through 42 U.S.C. § 1983, to hold Jamison, in his individual capacity, liable for these alleged violations of the Fourth Amendment.  Jamison contends that summary judgment is proper because: (1) Melvin did not violate Johnson's Fourth Amendment rights; (2) Jamison was not a "supervisor" and did not act with "deliberate indifference;" and (3) Jamison is entitled to qualified immunity.

**A.**

Jamison first argues that, because Plaintiff cannot prove a constitutional violation by Melvin, Jamison cannot be held liable as a matter of law.  There are disputed issues of fact that foreclose such a finding.[2]  Thus, the inquiry respecting Jamison's liability must proceed to the other arguments raised by Jamison.

**B.**

There is no question that supervisory officials may be held liable in certain circumstances for constitutional injuries inflicted by their subordinates.  See Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).  Such liability "is not premised upon *respondeat superior* but upon 'a recognition that supervisory

---

[2] This topic will be discussed fully in a Memorandum Opinion to be issued that denies Melvin's Motion for Summary Judgment.

indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Id. (quoting Slakan v. Porter, 737 F.2d 368, 372-73 (4th Cir. 1984)). This issue is "ordinarily one of fact, not law." Id.

The Fourth Circuit has set forth three elements necessary to establish supervisory liability under Section 1983:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff;
>
> (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the alleged offensive practices;
>
> (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Id. at 799 (citations omitted).

Jamison contends that he was not a "supervisor" for purposes of imposing liability under Section 1983. The Fourth Circuit explained in Shaw that, "'[r]ecognizing that supervisory liability can extend to the highest levels of state government,' we have noted that liability ultimately is determined 'by pinpointing the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." Id. (quoting Slakan, 737 F.3d at 376).

9

The Richmond City Code vests the City Manager with general supervisory powers over the various City departments. See Richmond City Code, § 5.01. The City Manager is "responsible to the Council for the proper administration of the City government." Id. The City Manager also has the power to "appoint for an indefinite term qualified officers and employees to head all the administrative departments of the City, and shall appoint, dismiss and discipline, . . . all officers and employees in such departments." § 5.02.

The City Code confers upon the Chief of Police the responsibility for the "general management and control of the department of police." § 2-272. The specific powers and duties of the Chief of Police include "assign[ing] all members of the department of police to their respective posts, shifts, details, and duties," "mak[ing] rules and regulations in conformity with the Charter and city ordinances" concerning "the operation of the department," "the conduct of the officers and employees of the department," "the training of the officers and employees," and "the penalties to be imposed for infractions of such rules and regulations." § 2-273. The Chief of Police is additionally "responsible for the efficiency, discipline and good conduct of the department." Id.

It is clear from the undisputed record that every aspect of the Plaintiff's claim in Count IV focuses on matters as to which the Chief of Police is given direct authority and control by the

10

City Code.  While the City Manager has a form of general managerial authority as to the Chief of Police and the officers in the police department, direct authority for all police operations is placed with the Chief of Police.  The Court is required to "pinpoint[] the person[] in the decisionmaking chain" when identifying the policymaker for liability purpose, and it is clear that the proper policymaker for purposes of the Plaintiff's claims in Count IV is the Chief of Police, not the City Manager.

The Plaintiff argues that Jamison appointed Gooch to her position as Chief of Police and that this led to the appointment of Melvin as head of the Task Force, which eventually led to the killing of Johnson.  See Pls.' Opp. to Calvin Jamison's Mot. for Summ. J. at 8.  The Plaintiff additionally argues that Jamison "made no effort to review [Gooch's] policies and actions in the department in order to make informed decisions concerning such discipline."  Id. at 9.  These claims are simply too attenuated to give Jamison supervisory liability.  To do so would be to effectively hold Jamison liable on a theory of *respondeat superior*, which, of course, cannot be done.  Having found that Jamison is not the supervisor for purposes of supervisory liability, it is unnecessary to analyze the remaining elements of the supervisory liability claim against Jamison.

11

### C.

And, having found that Jamison cannot be held liable under Section 1983 because he was not a supervisor, it is not necessary to consider whether Jamison is entitled to qualified immunity.

### CONCLUSION

For the foregoing reasons, Jamison's Motion for Summary Judgment will be granted, and the action will be dismissed with prejudice as to him.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

```
                                    /s/
                           Robert E. Payne
                           United States District Judge
```

Richmond, Virginia  
Date:_____