IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ROSA C. JOHNSON, personally and
as Personal Representative and
Administratix of the Estate of
Verlon M. Johnson, Sr., Deceased;
L.V.J., a Minor, by Rosa C.
Johnson, her Mother and Guardian;
L.Q.J., a Minor, by Rosa C.
Johnson, her Mother and Guardian;
V.M.J., a Minor, by Rosa C.
Johnson, his Mother and Guardian;
and V.J., a Minor, by Rosa C.
Johnson, his Mother and Guardian,

    Plaintiffs,

v.                                    Civil Action No. 3:04cv340

THE CITY OF RICHMOND, VIRGINIA;
FORMER ACTING SERGEANT DAVID D. MELVIN,
in his Individual Capacity; DETECTIVE
WILLIAM J. BURNETT, in his Individual
Capacity; FORMER ACTING CHIEF OF POLICE
TERESA P. GOOCH, in her Individual
Capacity; CITY MANAGER CALVIN D.
JAMISON, in his Individual Capacity,

    Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on Defendant Teresa P. Gooch's Motion for Summary Judgment (Docket No. 73). For the reasons set forth below, the motion is granted in part and denied in part.

**I.**

On May 14, 2004, Rosa C. Johnson, wife of the decedent Verlon Johnson, and mother of the minor children of the decedent, filed a civil complaint against the City of Richmond, the Richmond Police

Department, Former Acting Sergeant David D. Melvin, Detective William J. Burnett, Detective Eschen Tunstall, Police Captain Carol S. Nicely, Former Acting Chief of Police Teresa P. Gooch, and City Manager Calvin D. Jamison.  The Complaint consists of eight counts.

In Count IV of the Complaint, the Plaintiff alleges an individual capacity claim under Section 1983 against Teresa Gooch, former Interim Chief of the Richmond Police Department.  The allegations made against Gooch in Count IV of the Complaint are essentially the same as those made against the City.  In sum, the Plaintiff claims that Gooch is liable, as Melvin's supervisor, on three bases which, in the brief opposing the City's motion for summary judgment, the Plaintiff describes as "interrelated."  They are: (1) failure to train police officers in the use of force; (2) the failure to respond to use of force episodes; and (3) the appointment of Melvin to head the Task Force when he was not qualified to do so.

In the brief opposing Gooch's motion for summary judgment, the Plaintiff describes her claims in the same way in the index to the brief.[1]  However, in the text, the Plaintiff says that there are "asserted two interrelated grounds for [the] Section 1983 claim against Gooch."[2]  These "two interrelated grounds" are first,

---

[1] Plaintiff's Opposition To Defendant Theresa P. Gooch's Motion For Summary Judgment, pp. ii-iii (topic headings I, II and III) (hereinafter "Plaintiff's Opposition Br. at ___).

[2] Plaintiff's Opposition Br. at 5.

"several key failures in Melvin's training that caused him to shoot Johnson" and Gooch's deliberate indifference thereto;[3] and, second, Gooch's failure to investigate or respond adequately to a series of police-involved shootings, thereby creating an atmosphere which endorsed excessive force.[4]  Then, in presenting the details of these "two interrelated grounds" of liability, the Plaintiff's brief essentially reverts to making the same three arguments that were made against the City.[5]

**II.**

The facts must be considered in the light most favorable to the Plaintiff, according her the benefit of all reasonable inferences and resolving factual disputes in her favor.

On May 17, 2002, David D. Melvin was designated Acting Sergeant of the Richmond Police Department's Community Intelligence Team ("CIT") and the Robbery Auto Theft Task Force ("Task Force"). The City of Richmond formed the Task Force in May 2002 in response to a series of robberies in the Southside area of Richmond.  Melvin was designated to head the task force by Interim Chief of Police Teresa Gooch.  Also, on May 17, 2002, the City, through Jamison and Gooch, announced that it was "aggressively attacking" crime and

---

[3] Id.

[4] Id.

[5] The difference is that some of the underlying points are articulated differently.

planned to announce a public safety operation that would send a "strong message" to criminals.

On the same day, the CIT and the Task Force developed leads about an alleged robbery in the Southside area, and a suspect by the name of Bryant Terry was apprehended. Melvin assisted in a search of Terry's truck and recovered from it an assault-style rifle. The registered owner of the truck was discovered to be Verlon M. Johnson, Sr., the decedent in this case. During questioning Terry confessed that he had participated in a series of robberies and claimed that Johnson was also a participant. Terry also informed police officers that Johnson was known to carry a pistol in his pants pocket or waistband. It appears that Melvin learned of this statement. Based on this information, it was decided to seek arrest warrants for Terry and Johnson.

Beginning that afternoon, members of the Task Force conducted surveillance on the Johnson home. Two men were spotted leaving the driveway of the Johnson home in a truck. Police officers, including Burnett, stopped the truck and one of the occupants said that Johnson was in a shed behind his house cooking up crack cocaine. He also said that Johnson's wife, children, and a friend were all inside the home. Burnett testified that he did not recall whether the truck occupants had mentioned that Johnson was armed, but another officer recalled that they were informed that Johnson was armed. The record reflects that Melvin announced over police

4

Case 3:04-cv-00340-REP   Document 155   Filed 06/24/05   Page 5 of 17 PageID# 66

radio that Johnson was "probably armed" and that he was armed "99% of the time." According to Melvin and Burnett, both Melvin and Tunstall informed members of the Task Force that Johnson was a suspect in multiple robberies and was considered armed and dangerous.

After arrest warrants were issued, six police officers, including Melvin and Burnett, approached the Johnson home, deployed around it, and proceeded to attempt to serve the arrest warrant on Johnson. Johnson, his wife, a friend, and the four Johnson children were all in the home at this time.

Melvin and Burnett knocked on the front door of the Johnson home and Mrs. Johnson answered the door. The officers said that they needed to speak with her husband and asked where he was. Mrs. Johnson said that her husband was upstairs and called to him. At this time, Burnett stepped into the home, but Melvin remained outside. Burnett had not anticipated having to enter the home, but realized that it was necessary to do so because the configuration of the front door and the stairs required that the front door be closed for Johnson to descend to the first floor from the stairs. Burnett told Mrs. Johnson to put the children in the front room of the home. Burnett then told Johnson to come downstairs.

Johnson, who was unarmed and shirtless, came downstairs brushing his teeth. As Johnson descended the stairs, he put his hands up to the level of his head. Johnson closed the front door

radio that Johnson was "probably armed" and that he was armed "99% of the time." According to Melvin and Burnett, both Melvin and Tunstall informed members of the Task Force that Johnson was a suspect in multiple robberies and was considered armed and dangerous.

After arrest warrants were issued, six police officers, including Melvin and Burnett, approached the Johnson home, deployed around it, and proceeded to attempt to serve the arrest warrant on Johnson. Johnson, his wife, a friend, and the four Johnson children were all in the home at this time.

Melvin and Burnett knocked on the front door of the Johnson home and Mrs. Johnson answered the door. The officers said that they needed to speak with her husband and asked where he was. Mrs. Johnson said that her husband was upstairs and called to him. At this time, Burnett stepped into the home, but Melvin remained outside. Burnett had not anticipated having to enter the home, but realized that it was necessary to do so because the configuration of the front door and the stairs required that the front door be closed for Johnson to descend to the first floor from the stairs. Burnett told Mrs. Johnson to put the children in the front room of the home. Burnett then told Johnson to come downstairs.

Johnson, who was unarmed and shirtless, came downstairs brushing his teeth. As Johnson descended the stairs, he put his hands up to the level of his head. Johnson closed the front door

as he descended the stairs because the door was obstructing his way. After Johnson arrived on the first floor, Burnett instructed him to go outside. Burnett did not pat down, search, or handcuff Johnson, nor did Burnett communicate at all with Melvin at this time. Johnson walked outside the home with his hands still raised.

The parties set forth two very different versions of what transpired next. The Plaintiff claims either that Johnson never lowered his hands, or that, if Johnson lowered his hands at all, they were never near his pocket. An eyewitness, Theo Brinkley, a neighbor, claims that Johnson never lowered his hands. Gooch claims that, contrary to Melvin's instructions, Johnson stopped walking toward Melvin and lowered his right hand toward his right hip. Melvin claims that he perceived that Johnson's hand went into his pocket. Melvin also claims that he instructed Johnson to remove his hand from his pocket, and that, as Johnson removed it, Melvin perceived the hand exiting at a different angle than it had entered, which he believed indicated that Johnson had a weapon.[6] The parties agree that at this point Melvin raised and pointed his loaded .357 caliber automatic pistol at Johnson and fired a single

---

[6] Detective Oakes testified that Johnson reached into his pocket. Burnett testified that Johnson lowered his hands in an apparent effort to pull up his pants, but did not say that Johnson's hand went into his pocket. The other three officers did not see if Johnson lowered his hands or not, but did hear Melvin's instructions and the shot and did not corroborate Melvin's story about what was said and the time between the instructions and the shot.

6

shot into Johnson's chest. Johnson fell back on to the porch and died. A subsequent search of Johnson revealed that he had no weapon. A post-mortem blood test revealed the presence of cocaine, morphine, and a heroin metabolite in Johnson's system. These basic facts provide the background for analysis of the summary judgment motion. Additional facts, pertinent to the several components of the claims against Gooch will be dismissed as part of the analysis of the claims.

### III.

The standards for review of summary judgment motions are well-established. Summary judgment is proper only when there are no genuine issues as to any material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In making this determination the Court may rely upon "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed. R. Civ. P. 56(c).

In reviewing a motion for summary judgment, a court must view the facts and any inferences drawn from these facts in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Nguyen v. CNA Corp., 44 F.3d 234, 236 (4th Cir. 1995). A fact is material when proof of its existence or nonexistence would affect the outcome of the case, and an issue is genuine if a reasonable jury might return

a verdict in favor of the nonmoving party on the basis of such issue. Anderson v. Liberty Lobby, 477 U.S. at 248.

The nonmoving party is entitled to have her version of all that is disputed accepted, all conflicts resolved in her favor, and to have the benefit of all favorable legal theories invoked by the evidence. M&M Med. Supplies and Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 163 (4th Cir. 1992). The party who bears the burden of proof on an issue at trial, however, cannot survive summary judgment without sufficient evidence to sustain his or her burden of proof on that point. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). These precepts and standards govern the resolution of Gooch's motion.

**IV.**

As is the case in the claim against the City, the claim against Gooch in Count IV is the alleged violation of a federal constitutional right, specifically the Fourth Amendment, that is presented in this Court under the auspices of 42 U.S.C. § 1983 which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution ... shall be liable to the party injured in an action at law.

8

Section 1983 is not itself a source of substantive rights; rather it provides a method for vindicating federal rights elsewhere conferred. Albright v. Oliver, 510 U.S. 266, 271 (1994); Westmoreland v. Brown, 883 F. Supp. 67, 71 (E.D. Va. 1995).

To establish liability under Section 1983, a plaintiff must show that the defendant, acting under color of state law, violated the plaintiff's federal, constitutional or statutory rights and thereby caused the complained of injury. Coppage v. Mann, 906 F. Supp. 1025, 1035 (E.D. Va. 1995). Count IV, of course, has its genesis in alleged use of excessive force by Melvin in effectuating the arrest of Johnson, thereby offending the Fourth Amendment. To attribute liability to Gooch for Melvin's conduct, the Plaintiff advances the interrelated grounds of liability previously described and seeks to fix the responsibility for Melvin's conduct on Gooch, as Melvin's supervisor, who failed in the particulars outlined in the interrelated grounds.

**A.   Failure to Train: Supervisory Liability**

Supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates. See Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). Such liability "is not premised upon *respondeat superior* but upon 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to

9

their care.'" Id. (quoting Slakan v. Porter, 737 F.2d 368, 372-73 (4th Cir. 1984)). This issue is "ordinarily one of fact, not law." Id.

To establish supervisory liability in a failure to train claim, the plaintiff must demonstrate that: (1) the subordinate actually violated the constitutional rights at issue; (2) the supervisor failed properly to train the subordinates, thereby illustrating a "deliberate indifference" to the rights of the persons with whom the subordinates come into contact; and (3) the failure to train actually caused the subordinates to violate the constitutional right at issue. City of Canton v. Harris, 489 U.S. 378, 388 (1989); Brown v. Mitchell, 327 F. Supp. 2d 615, 651 (E.D. Va. 2004) (citing Doe v. Broderick, 225 F.3d 440, 456 (4th Cir. 2000)); Carter v. Morris, 164 F.3d 215, 221 (4th Cir. 1999).

The failure to train claim against Gooch is essentially the same as the failure to train claim against the City and the analysis of that claim against the City is equally applicable to the claim against Gooch. For the same reasons that the City is not entitled to summary judgment on the Plaintiff's failure to train claim, neither is Gooch.

**B. Gooch's Alleged Failure to Respond to Use of Force Episodes**

This claim, like the similar interrelated claim against the City in Count IV, depends, in the first instance, upon the presence of a pattern of the unconstitutional use of force by Richmond

10

police in the 29 instances to which the Plaintiff points to establish a pattern. For the reasons set forth in the Memorandum Opinion on the City's motion for summary judgment, this interrelated base of liability fails for the absence of its predicate--a pattern of the unconstitutional use of force. Accordingly, for the same reasons, that the City is entitled to summary judgment on this aspect of the Plaintiff's claim in Count IV, so too is Gooch.[7]

## V.

Gooch alternatively argues that she is entitled to qualified immunity from suit. Qualified immunity shields officials from civil liability in so far as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). First, a court must consider whether the facts, taken in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). If the answer is no, the inquiry ends there and the official is entitled to qualified

---

[7] Although the Complaint, and to a certain extent, the brief opposing the City's motion for summary judgment, recites a constitutional violation in the appointment of Melvin to head the Task Force, a decision made by Gooch, the Plaintiff's brief in opposition to the motion for summary judgment does not press this point as a theory of liability against Gooch. Hence, it is unnecessary to discuss that issue. But, if the Plaintiff does intend to pursue Count IV against Gooch on this theory, it fails for the same reason it failed against the City.

11

immunity. Id. at 200. If, however, there is a violation, it is necessary then to ascertain whether that right was clearly established at the time of the violation. Id. at 201.

### 1. Violation of Right

As explained fully in the Memorandum Opinion denying Melvin's motion for summary judgment and rejecting his claim of qualified immunity, there are genuine disputes of material facts respecting the violation of the constitutional right. A reasonable jury could find that there was an unconstitutional use of force in effectuating the arrest of Johnson. Likewise, as explained fully in the Memorandum Opinion denying the City's motion for summary judgment, there are genuine disputes of material fact respecting the training of Richmond's police officers, including Melvin, in the use of force when effectuating arrests, and the question of deliberate indifference. These several disputes of material fact foreclose summary judgment in Gooch's favor on the question whether there was a violation of the Fourth Amendment for which she can be held responsible.

### 2. The "Clearly Established" Issue

The next inquiry is whether that right was clearly established at the time of the violation. A right is "clearly established" if, "it would be clear to a reasonable [official] that h[er] conduct was unlawful in the situation [s]he confronted." Saucier v. Katz,

12

533 U.S. 194, 202 (2001). The unlawfulness "must be apparent" to the official "in light of pre-existing law." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

In resolving whether a right was "clearly established" at the time of the alleged deprivation, the court must define the allegedly violated right "'at a high level of particularity.'" Wilson v. Kittoe, 337 F.3d 392, 403 (4th Cir. 2003) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 250-51 (4th Cir. 1999)); see also Gooden v. Howard County, 954 F.2d 960, 968 (4th Cir. 1992) (*en banc*). Thus, for example, although it is clearly established that citizens have a right, under the Fourth and Fourteenth Amendments, to be free from unreasonable seizures, it would be improper to define the right here at issue at such a general level. Indeed, to do so would risk converting the qualified immunity doctrine into "a rule of virtually of unqualified liability simply by alleging violations of extremely abstract rights." Anderson v. Creighton, 483 U.S. at 639.

Accordingly, the proper resolution of a qualified immunity defense requires an inquiry into whether the right at issue was clearly established in a more particularized and fact intensive sense. Parrish v. Cleveland, 372 F.3d 294, 301 (4th Cir. 2004). The contours of the right violated must be "sufficiently clear that a reasonable official would understand that what he is doing

13

violates that right." Anderson v. Creighton, 483 U.S. at 640.[8] This requires identifying the specific conduct of the defendant being challenged by the plaintiff and then determining whether a reasonable official in the defendant's position would have realized that the specific conduct violated the plaintiff's rights. Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992).[9]

Defining the right in this manner does not mean, as Gooch contends, that the right must be defined to take into account every fact of the specific case under consideration. According to Gooch, she is entitled to qualified immunity because, at the time of Johnson's death in May 2002, there was no case holding that the failure to train, as the issue is presented by the evidence in this case, offended the Constitution. That view of qualified immunity is erroneous.

> Indeed, to ascertain whether a right is
> 'clearly established' as posited by [Gooch]
> would mean that until a particular fact
> pattern (or an almost identical fact pattern)

---

[8] Accordingly, the determination whether a right was "clearly established" requires the Court to undertake an objective inquiry, dependant not on the subjective beliefs of a particular defendant official, but instead on what a hypothetical reasonable official would have done in the circumstances presented. Wilson v. Kittoe, 377 F.3d at 402.

[9] In resolving what constitutes "clearly established law," courts in the Fourth Circuit are instructed to look only to the decisions of the Supreme Court of the United States, the Fourth Circuit itself, as well as the highest court in the state in which the case arose. Wilson v. Kittoe, 337 F.3d at 402.

14

> had been judicially determined to infringe a constitutional right and, thereafter, repeated itself, officials would remain immune from Section 1983 liability. Contrary, however, to [Gooch's] argument, the nonexistence of controlling authority holding that the defendant's identical (or virtually identical) conduct is unlawful does not guaranty qualified immunity. Amaechi v. West, 237 F.3d 356, 362 (4th Cir. 2001). 'Clearly established' does not mean that the very actions in question have previously been held unlawful; rather it merely means that in light of preexisting law the unlawfulness of the official's conduct was reasonably and objectively apparent. Wilson v. Layne, 526 U.S. 603, 615, 119 S. Ct. 1692, 143 L.Ed.2d 818 (1999). Qualified immunity is not intended to relieve government officials from the responsibility of applying settled legal principles to new, but reasonably analogous situations; there need not exist a case on 'all fours' with the fact pattern presented by the case under review before Section 1983 liability can attach. Parrish, 372 F.3d at 301; Kittoe, 377 F.3d at 403.

Brown v. Mitchell, 327 F. Supp. 2d at 649.

In sum, to resolve the qualified immunity defense, it is appropriate to consider not only already specifically adjudicated rights and situations, but also those rights and situations that are "manifestly included within more general applications of the core constitutional principle involved." Amaechi v. West, 237 F.3d at 362-63 (internal citations and quotations omitted); see also Wilson v. Layne, 526 U.S. 603, 615 (1999); Wilson v. Kittoe, 337 F.3d at 403.

15

The core constitutional principle involved here is the need to train police officers in the use of deadly force. It has been settled that "the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be so 'obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." <u>City of Canton v. Harris</u>, 489 U.S. at 390 n.10 (citing <u>Tennessee v. Gardner</u>, 471 U.S. 1 (1985)). Considering that the duty of a police officer inevitably will involve effectuating the arrest of dangerous felons, city policymakers, such as Gooch, are charged with the knowledge that inadequate training is likely to result in the violation of constitutional rights. <u>City of Canton v. Harris</u>, 489 U.S. at 390. Moreover, there is evidence here that the training given to Richmond police officers falls considerably below the national standard, a standard which Gooch, as Chief of Police, is charged with knowing.[10] Under the circumstances, the right at issue was clearly established within the meaning of the decisions of the Supreme Court of the United States and the Fourth Circuit.

---

[10] At one stage of briefing, Gooch argued that she could not be "deliberately indifferent" because, at the time of Johnson's death, she had been Interim Chief of Police only for three months. That argument appears to have been abandoned but, if not, it is not well-taken given that, for several years before her appointment as Interim Chief of Police, Gooch was in charge of training for the Richmond Police Department and considering that, in the past, Goode has served as Acting Police Chief on at least one previous occasion. Thus, her knowledge and accountability are factual matters to be resolved by the jury.

Therefore, granting summary judgment on the grounds of qualified immunity is inappropriate.

## CONCLUSION

For the foregoing reasons, the Court finds that there remain genuine disputed issues of material facts which preclude summary judgment on the failure to train claim against Gooch and on Gooch's assertion of qualified immunity.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record by facsimile and regular mail.

It is so ORDERED.

```
                                    /s/
                            Robert E. Payne
                            United States District Judge
```

Richmond, Virginia
Date:_____