**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

ROSA C. JOHNSON, personally and
as Personal Representative and
Administratix of the Estate of
Verlon M. Johnson, Sr., Deceased;
L.V.J., a Minor, by Rosa C.
Johnson, her Mother and Guardian;
L.Q.J., a Minor, by Rosa C.
Johnson, her Mother and Guardian;
V.M.J., a Minor, by Rosa C.
Johnson, his Mother and Guardian;
and V.J., a Minor, by Rosa C.
Johnson, his Mother and Guardian,

     Plaintiffs,

v.                           Civil Action No. 3:04cv340

THE CITY OF RICHMOND, VIRGINIA;
FORMER ACTING SERGEANT DAVID D. MELVIN,
in his Individual Capacity; DETECTIVE
WILLIAM J. BURNETT, in his Individual
Capacity; FORMER ACTING CHIEF OF POLICE
TERESA P. GOOCH, in her Individual
Capacity; CITY MANAGER CALVIN D.
JAMISON, in his Individual Capacity,

     Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on the City of Richmond's
Motion for Summary Judgment (Docket No. 75). For the reasons set
forth below, the motion is granted in part and denied in part.

**I.**

On May 14, 2004, Rosa C. Johnson, wife of the decedent Verlon
Johnson, and mother of the minor children of the decedent, filed a
civil complaint against the City of Richmond, the Richmond Police

1Department, Former Acting Sergeant David D. Melvin, Detective William J. Burnett, Detective Eschen Tunstall, Police Captain Carol S. Nicely, Former Acting Chief of Police Teresa P. Gooch, and City Manager Calvin D. Jamison.  The Complaint consists of eight counts.

In Count IV of the Complaint, the Plaintiff alleges that the City of Richmond is liable under Section 1983 for failing to train officers in the proper use of force, in making arrests, and in identifying and managing high-risk situations.  Additionally, the Plaintiff alleges that the City condoned a policy, custom, and practice of excessive force by improperly investigating and disciplining officers involved in use of force incidents, that the City was deliberately indifferent to a persistent pattern of police shootings, and that the City inappropriately assigned Melvin to head the Robbery Auto Theft Task Force.

## II.

The facts must be considered in the light most favorable to the Plaintiff, according her the benefit of all reasonable inferences and resolving factual disputes in her favor.

On May 17, 2002, David D. Melvin was designated Acting Sergeant of the Richmond Police Department's Community Intelligence Team ("CIT") and the Robbery Auto Theft Task Force ("Task Force"). The City of Richmond formed the Task Force in May 2002 in response to a series of robberies in the Southside area of Richmond.  Melvin was designated to head the task force by Interim Chief of Police

2

Teresa Gooch.  Also, on May 17, 2002, the City, through Jamison and Gooch, announced that it was "aggressively attacking" crime and planned to announce a public safety operation that would send a "strong message" to criminals.

On the same day, the CIT and the Task Force developed leads about an alleged robbery in the Southside area, and a suspect by the name of Bryant Terry was apprehended.  Melvin assisted in a search of Terry's truck and recovered from it an assault-style rifle.  The registered owner of the truck was discovered to be Verlon M. Johnson, Sr., the decedent in this case.  During questioning, Terry confessed that he had participated in a series of robberies and claimed that Johnson was also a participant. Terry also informed police officers that Johnson was known to carry a pistol in his pants pocket or waistband.  It appears that Melvin learned of this statement.  Based on this information, it was decided to seek arrest warrants for Terry and Johnson.

Beginning that afternoon, members of the Task Force conducted surveillance on the Johnson home.  Two men were spotted leaving the driveway of the Johnson home in a truck.  Police officers, including Burnett, stopped the truck and one of the occupants said that Johnson was in a shed behind his house cooking up crack cocaine.  He also said that Johnson's wife, children, and a friend were all inside the home.  Burnett testified that he did not recall whether the truck occupants had mentioned that Johnson was armed,

3

but another officer recalled that they were informed that Johnson was armed.   The record reflects that Melvin announced over the police radio that Johnson was "probably armed" and that he was armed "99% of the time."  According to Melvin and Burnett, both Melvin and Tunstall informed members of the Task Force that Johnson was a suspect in multiple robberies and considered armed and was dangerous.

After arrest warrants were issued, six police officers, including Melvin and Burnett, approached the Johnson home, deployed around it, and proceeded to attempt to serve the arrest warrant on Johnson.   Johnson, his wife, a friend, and the four Johnson children were all in the home at this time.

Melvin and Burnett knocked on the front door of the Johnson home and Mrs. Johnson answered the door.   The officers said that they needed to speak with her husband and asked where he was.  Mrs. Johnson said that her husband was upstairs and called to him.  At this time, Burnett stepped into the home, but Melvin remained outside.  Burnett had not anticipated having to enter the home, but realized that it was necessary to do so because the configuration of the front door and the stairs required that the front door be closed for Johnson to descend to the first floor from the stairs. Burnett told Mrs. Johnson to put the children in the front room of the home.  Burnett then told Johnson to come downstairs.

4

Johnson, who was unarmed and shirtless, came downstairs brushing his teeth.  As Johnson descended the stairs, he put his hands up to the level of his head.  Johnson closed the front door as he descended the stairs because the door was obstructing his way.  After Johnson arrived on the first floor, Burnett instructed him to go outside.  Burnett did not pat down, search, or handcuff Johnson, nor did Burnett communicate at all with Melvin at this time.  Johnson walked outside the home with his hands still raised.

The parties set forth two very different versions of what transpired next.  The Plaintiff claims either that Johnson never lowered his hands, or that, if Johnson lowered his hands at all, they were never near his pocket.  An eyewitness, Theo Brinkley, a neighbor, claims that Johnson never lowered his hands.  The City claims that, contrary to Melvin's instructions, Johnson stopped walking toward Melvin and lowered his right hand toward his right hip.  Melvin claims that he perceived that Johnson's hand went into his pocket.  Melvin also claims that he instructed Johnson to remove his hand from his pocket, and that, as Johnson removed it, Melvin perceived the hand exiting at a different angle than it had entered, which he believed indicated that Johnson had a weapon.[1]

---

[1]  Detective Oakes testified that Johnson reached into his pocket.  Burnett testified that Johnson lowered his hands in an apparent effort to pull up his pants, but did not say that Johnson's hand went into his pocket.  The other three officers did not see if Johnson lowered his hands or not, but did hear Melvin's instructions and the shot and did not corroborate Melvin's story about what was said and the time between the instructions and the shot.

The parties agree that at this point Melvin raised and pointed his loaded .357 caliber automatic pistol at Johnson and fired a single shot into Johnson's chest.  Johnson fell back on to the porch and died.  A subsequent search of Johnson revealed that he had no weapon.  A post-mortem blood test revealed the presence of cocaine, morphine, and a heroin metabolite in Johnson's system.

These basic facts provide the background for analysis of the summary judgment motion.  Additional facts, pertinent to the several components of the claim against the City, will be discussed as part of the analysis of the claims.

## III.

The standards for the review of summary judgment motions are well-established.  Summary judgment is proper only when there are no genuine issues as to any material facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1987).  In making this determination the Court may rely upon "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits."  Fed. R. Civ. P. 56(c).

In reviewing a motion for summary judgment, a court must view the facts and any inferences drawn from these facts in the light most favorable to the nonmoving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Nguyen v. CNA Corp., 44 F.3d 234, 236 (4th Cir. 1995).  A fact is material when

6

proof of its existence or nonexistence would affect the outcome of the case, and an issue is genuine if a reasonable jury might return a verdict in favor of the nonmoving party on the basis of such issue. <u>Anderson</u>, 477 U.S. at 248.

The nonmoving party is entitled to have her version of all that is disputed accepted, all conflicts resolved in her favor, and to have the benefit of all favorable legal theories invoked by the evidence. <u>M&M Med. Supplies and Serv., Inc. v. Pleasant Valley Hosp., Inc.</u>, 981 F.2d 160, 163 (4th Cir. 1992). The party who bears the burden of proof on an issue at trial, however, cannot survive summary judgment without sufficient evidence to sustain his or her burden of proof on that point. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986). These precepts and standards govern the resolution of the City's motion.

**IV.**

It is well to remember that the claim in Count IV is the alleged violation of a federal constitutional right, specifically the Fourth Amendment, that is presented in this Court under the auspices of 42 U.S.C. § 1983 which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution ... shall be liable to the party injured in an action at law.

7

Section 1983 is not itself a source of substantive rights; rather, it provides a method for vindicating federal rights elsewhere conferred.  Albright v. Oliver, 510 U.S. 266, 271 (1994); Westmoreland v. Brown, 883 F. Supp. 67, 71 (E.D. Va. 1995).

To establish liability under Section 1983, a plaintiff must show that the defendant, acting under color of state law, violated the plaintiff's federal constitutional or federal statutory rights, and thereby caused the complained of injury. Coppage v. Mann, 906 F. Supp. 1025, 1035 (E.D. Va. 1995).  Cities are "person[s]" amenable to suit within the meaning of Section 1983; however, municipal liability may not be predicated upon a theory of vicarious liability or respondeat superior.  Monell v. Dep't of Soc. Serv. of City of N.Y., 436 U.S. 658, 694 (1978).  Rather, under Monell, municipal liability under Section 1983 arises only where the municipality, *qua municipality*, has undertaken an official policy or custom which causes a deprivation of the plaintiff's federal constitutional or statutory rights.  Id.; see also Spell v. McDaniel, 824 F.2d 1380, 1385 (4th Cir. 1987); Donaggio v. Arlington County, 880 F. Supp. 446, 461 (E.D. Va. 1995).

In any case of municipal liability, "there must be an official whose acts reflect governmental policy . . . when an official has final authority in a matter involving the selection of goals or of means of achieving goals, his choices represent government policy."

8

<u>Spell v. McDaniel</u>, 591 F. Supp. 1090, 1108 (E.D.N.C. 1984).  A policy is fairly attributed to a principality when "it is directly . . . made by a municipal agency . . . or official . . . having final authority to establish and implement the relevant policy." <u>Spell v. McDaniel</u>, 824 F.2d at 1389.

In this case, the record is clear that the Chief of Police for the City is the policymaker to, and through, whom liability for the conduct of police activity may be attributed to the City.  The Richmond Police Chief has final control over police policies, training, discipline, and the day-to-day operations of the Department.  The City Code grants the Chief of Police "general management and control of the department of police." Richmond City Code § 2-272.  The specific powers and duties of the Chief of Police include "assign[ing] all members of the department of police to their respective posts, shifts, details, and duties," "mak[ing] rules and regulations in conformity with the Charter and city ordinances" concerning "the operation of the department," "the conduct of the officers and employees of the department," "the training of the officers and employees," and "the penalties to be imposed for infractions of such rules and regulations." § 2-273. The Chief of Police is additionally "responsible for the efficiency, discipline and good conduct of the department." <u>Id.</u>

To establish municipal liability, the Plaintiff must "(1) identify[] the specific 'policy' or 'custom;' (2) fairly

9

attribut[e] the policy and fault for its creation to the municipality; and (3) find[] the necessary 'affirmative link' between identified policy or custom and specific violation." Spell v. McDaniel, 824 F.2d at 1390.   Count IV, of course, has its genesis in the alleged use of excessive force by Melvin in effectuating the arrest of Johnson, thereby offending the Fourth Amendment.   To attribute liability to the City for Melvin's conduct, the Plaintiff advances "three interrelated bases of liability:"[2] (1) the failure to train police officers in the use of force;[3] (2) the failure to respond to use of force episodes;[4] and (3) the appointment of Melvin to head the Task Force without ensuring that he was trained to fulfill that role.[5]  These "three interrelated bases" are the customs and policies on which the Plaintiff relies to satisfy the first and second requirements of a municipal responsibility claim.  Each will be considered in turn.

## A.   The Failure to Train Basis of Liability

The failure to train theory here is comprised of two basic components.  The contention is that the City fails to give "general

---

[2]  Plaintiff's Opposition To Defendant City Of Richmond, Virginia's Motion For Summary Judgment, p. 5 (hereinafter "Plaintiff's Opposition Br. at ___").

[3]  Plaintiff's Opposition Br. at 5-22.

[4]  Plaintiff's Opposition Br. at 23-35.

[5]  Plaintiff's Opposition Br. at 36.

10

use of force training;[6] and that the City fails to train on arrest procedures implicating the use of force, specifically four arrest procedures (dealing with suspects who put their hands in their pants); use of "cover" and lighting, handling high-risk operations; training specialized units like the Task Force.[7]   It is rather clear that "[t]he imposition of supervisory liability on a failure to train theory is merely a more specific formulation of the Monell "official policy or custom inquiry wherein the official "policy or custom" is the training program (or lack thereof)."   Brown v. Mitchell, 308 F. Supp. 2d at 702-03 (citing Spell v. McDaniel, 824 F.2d at 1389-90).

The Supreme Court of the United States has held that, under certain circumstances, the failure to train a subordinate can create municipal liability.   See generally, City of Canton v. Harris, 489 U.S. 378, 388 (1989) ("We hold today that the inadequacy of . . . training may serve as the basis for [42 U.S.C.] § 1983 liability . . . where the failure to train amounts to deliberate indifference to the rights of persons with whom the [subordinates] . . . come into contact").   To impose liability under a failure to train theory, a plaintiff must plead and prove that: (1) employees of the City actually violated the Plaintiff's constitutional or statutory rights; (2) the City failed to train

---

[6] Plaintiff's Opposition Br. at 7-11.

[7] Plaintiff's Opposition Br. at 11-14.

properly its employees, thereby illustrating a "deliberate indifference" to the rights of the persons with whom the employees come into contact; and (3) the failure to train actually caused the employees to violate the Plaintiff's rights. <u>City of Canton v. Harris</u>, 489 U.S. at 388-92; <u>Brown v. Mitchell</u>, 308 F. Supp. 2d 682, 701-02 (citing <u>Doe v. Broderick</u>, 225 F.3d 440, 456 (4th Cir. 2000)); <u>Carter v. Morris</u>, 164 F.3d 215, 221 (4th Cir. 1999); Anthony D. Schroeder, <u>Note</u> <u>The Deliberate Indifference Standard In 42 U.S.C. Section 1983 Municipal Liability Failure To Train Cases</u>, 22 U. Tol. L Rev. 107, 126 (1990).

## 1.   Actual Violation

The first element of a failure to train claim requires that the Plaintiff establish an actual violation of a person's constitutional rights by an employee of the City. <u>Id.</u>   As explained fully, in the Memorandum Opinion denying Melvin's motion for summary judgment, there are genuine disputes of material fact respecting whether Melvin actually violated Johnson's Fourth Amendment right. A reasonable jury could find a violation and thus this aspect of the Plaintiff's failure to train claim has been satisfied and hence summary judgment cannot be based on a defect of proof on this element of the claim.

## 2.    Deliberate Indifference

The second element of the failure to train claim requires a showing that the municipality failed to properly train subordinates in a way that demonstrates a "deliberate indifference" to the rights of the persons with whom the subordinates come into contact. Id.  The risk of a constitutional injury must be "plainly obvious" or a "highly predictable consequence" of a municipal policy or practice for liability to attach.  City of Canton v. Harris, 489 U.S. at 390 n.10.   Additionally, "the fact that more or better training could have been instituted is not enough by itself to establish a claim for deliberate indifference."   Guerra v. Montgomery County, 118 Fed. Appx. 673, 676 (4th Cir. 2004) (citing City of Canton v. Harris, 489 U.S. at 390-99).[8]

### (a)    The Alleged Pattern of Use of Excessive Force

There are two ways to show "deliberate indifference" for failure to train.  The first is where the City is "actually aware of the fact that its subordinates are regularly violating constitutional or statutory rights."  Brown v. Mitchell, 308 F. Supp. 2d at 703.  The Plaintiff claims that this showing has been made because the City knew that there was a pattern of police-

---

[8] Unpublished decisions of the United States Court of Appeals for the Fourth Circuit are not binding precedent, but they are useful analytical tools.  And, the cited principle is a correct one.

13

involved shootings, and that the City did not respond to this pattern by offering any remedial training.[9]

Indeed, the Plaintiff argues that the City developed a "custom or usage" of failing to respond to use of force episodes and that the custom became widespread and that the City demonstrated deliberate indifference by failing to stop the excessive force. The Plaintiff also contends that the City neither adopted measures to deal with complaints of excessive force nor properly investigated such complaints.

A municipal custom may arise outside of "formal decisionmaking channels," if a practice is "so 'persistent and widespread' and 'so permanent and well settled as to constitute a custom or usage with the force of law.'" Carter v. Morris, 164 F.3d at 218. Municipal fault for allowing a "custom or usage" to continue depends upon "actual or constructive knowledge of its existence by responsible policymakers" and "their failure, as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices." Spell v. McDaniel, 824 F.2d at 1391. Constructive

---

[9] In an effort to flesh out this theory, the Plaintiff points out that the City has not insisted on the completion of certain required forms following police-involved shootings so that the City can determine what training may be necessary and can identify trends and practices. Also, the Plaintiff notes that the City had an "early warning" system, which was intended to prompt review when a specific number of complaints were filed against an officer, but that the City did not adequately implement this system, citing Melvin as a specific example because he had several complaints filed against him and the City "barely responded at all."

knowledge "may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these." Id.  A "sufficiently close causal link between such a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." Id.

No matter how this iteration of the failure to train claim is particularized, its validity depends upon the existence of a pattern of excessive force events involving the shooting of citizens by police in the course of performing their official duties.  Although it is unclear how many constitutional violations constitute a pattern or custom, the Fourth Circuit has made clear that one prior incident is not enough. Carter v. Morris, 164 F.2d at 220; Spell v. McDaniel, 824 F.2d at 1387-88.

Here, the Plaintiff grounds the pattern in 29 incidents in which Richmond officers have been investigated for discharging their firearms.  The Plaintiff acknowledges that not all of these incidents, which occurred over a five year period, involved unconstitutional conduct, but contends that many of them did, citing particularly to several incidents that, according to the Plaintiff, appear to have involved the unconstitutional use of deadly force because the officer did not appear to have probable

15

cause to believe that the suspects posed an imminent threat of serious bodily harm.  Additionally, Plaintiff posits that other specific incidents may have involved unconstitutional conduct, but asserts that the City failed to conduct an adequate investigation and review of those incidents.  Taken together, the Plaintiff argues that these incidents create a genuine issue of material fact as to whether the use of excessive force by Richmond police officers was "widespread," i.e., whether there was a pattern of unconstitutional conduct involving the excessive use of force.

The City responds to this contention by asserting that the 29 incidents cited by the Plaintiffs do not establish a pattern of unconstitutional conduct involving the excessive use of force. Specifically, the City has shown that, in 14 of the 29 incidents, the suspects were armed with a gun; and that, in 12 of those 14 incidents, the suspects actually fired at the officers.  The City also has shown that, in four of the remaining 15 incidents, the police officer accidentally discharged a firearm and no one was injured.  In six of the remaining 11 incidents, the suspect threatened the police officers with a vehicle.  In one of the remaining five incidents, the police officers shot a dog.  In another incident, the officer discharged the firearm during a struggle with a suspect who was attempting to take the gun from the officers.  In another incident, officers used breaching rounds to open a door during a raid on a home and killed an unarmed woman

16

standing behind the door.  That, according to the City, leaves two incidents involving the shooting of an unarmed suspect, both of which, according to the City, are not similar to this case.  The first incident involved a suspect who called the police and warned them that he was armed.  The suspect then exited a building with an object wrapped in cloth and pointed it at the police officers.  The officers responded by shooting the suspect who turned out to be unarmed.  The second incident involved a suspect who had been seen with a gun just before he was shot, and the gun was recovered nearby after the incident.

The City is correct that none of the 29 incidents on which the Plaintiff predicates the existence of a pattern are sufficiently similar to each other, or to the one in this case, to be considered as establishing a pattern of the unconstitutional use of force. Therefore, the Plaintiff has failed to establish a pattern of unconstitutional use of force that would have put a policymaker on notice of the need for additional or better training, as to which the failure to accomplish would constitute deliberate indifference.

### (b)   Failure to Train on Recurrent Known Risks

The second way to establish "deliberate indifference" is to show that the municipality "fails to train 'employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is sure to face.'"  Brown v. Mitchell, 308 F.

17

Supp. 2d at 704 (quoting <u>City of Canton v. Harris</u>, 489 U.S. at 396).  As explained in <u>Brown</u>, "because of the clear and recurrent nature of certain rights, the supervisory power is on fair notice that a failure to train respecting such rights will result in a deprivation even in situations where no pattern of deprivation has yet to develop."  <u>Id.</u>  And, as the City correctly has observed, cases in which liability is not premised upon a pattern of constitutional violations involve "quite narrow circumstances." <u>Milligan v. City of Newport News</u>, 743 F.2d 227, 229-30 (4th Cir. 1994).

The Supreme Court specifically has noted that "the need to train officers in the constitutional limitations of deadly force . . . can be said to be 'so obvious,' that the failure to do so could probably be characterized as 'deliberate indifference' to constitutional rights." <u>City of Canton v. Harris</u>, 489 U.S. at 390 n.10.  In sum, the failure to provide adequate training in the use of deadly force constitutes deliberate indifference because officers are certain to face the need to apply such force and the consequences of doing so are permanent and severe.  The likelihood of the use of lethal force certainly is increased where, as here, officers are part of a task force conducting arrests of suspects who are charged with having committed violent crimes.

### 3.   The Record Respecting Training in the Use of Force

The next issue is the state of the record respecting whether the City's training in the use of force in effectuating arrest procedures was adequate.   That matter is the subject of considerable dispute in this record.

The Plaintiff begins the discussion by pointing to Melvin's training, as illustrative of the lack of training.   Melvin was trained at the Richmond Police Academy from May until November 1997.   During that training period, Melvin received the written tests mandated by the Virginia Department of Criminal Justice Services and certain practical tests respecting the use of force. There is evidence that Melvin's written test record indicates that, under the Academy's rules, Melvin should have been discharged from the Academy for failing three times.   However, for reasons not readily apparent, Melvin eventually was allowed to graduate, albeit in the bottom ten-percent of his class.   The record also permits the inference that, following his initial training at the Police Academy, Melvin did not receive any use of force training.   The Plaintiff also has offered evidence from which a jury could find that Melvin's own lack of training was reflective of the situation in the Richmond Police Department, as a whole.

The City responds to the showing made by the Plaintiff by pointing to evidence from which a jury could find that the general

training program is not deficient.  For example, the City points out that the Richmond Police Department is accredited by the Virginia Law Enforcement Professional Standards Commission, which ensures that the Department meets or exceeds 180 different standards.  The Department is also certified by Virginia's Department of Criminal Justice ("DCJS"), which provides mandatory training and curriculum standards, under which all Richmond police officers are certified.

The City also has offered evidence that the Richmond Police Department trains its officers on the use of force and that this training meets or exceeds constitutional and state standards.  The City cites specifically to General Order 803-1, which provides that officers should first attempt to control a suspect through verbal commands, and that, if force must be used, the officers are permitted only to use the level of force reasonable and necessary to control an incident.  The General Order also provides that deadly force is permissible only when an officer objectively and reasonably believes a suspect poses an immediate threat of death or serious bodily harm to the officer or others.  The City offered evidence that the Richmond Police Department incorporated two state-of-the-art computer simulation programs into its use of force training to train officers in split second decisions on when to use deadly force.  It remains disputed whether Melvin himself received

that training.  Additionally, every 24 months each officer receives 40 hours of additional "in-service" training.  The City adds that the use of cover is incorporated into both computer simulation training programs.

Relying on expert testimony, the Plaintiff has presented evidence that, although the City's training program appears adequate on the surface, a more thorough review of the training program reveals that it is not consistent with nationally accepted police standards and practices.  In that regard, the Plaintiff points to evidence that there is no mandated use of force training that officers must receive after graduating from the Academy, and that there is no evidence that officers are given regular use of force training following graduation.  Plaintiff's expert explained that national standards require training on the agency's use-of-deadly force policies at least annually.  As further evidence on this issue, the Plaintiff quotes from the depositions of several current officers who demonstrated ignorance of the use of force policies outlined in the General Order on which the City so heavily relies to show that it provides adequate training in the use of force.

The expert witness offered by the Plaintiff has opined that, when the City does provide use of force training, it is limited and ineffective.  In that regard, the expert explains that the City

21

fails to train its officers on a Use of Force Continuum, which is recommended by DCJS. This continuum teaches the several steps, ranging from less to more lethal alternatives, which are to be taken before using deadly force. The current Richmond Chief of Police, Chief Monroe, acknowledged publicly that there was a gap in the City's training when it came to alternatives to deadly force.

There is evidence that, according to generally accepted practice, use of force training must include so-called "shoot/no shoot" scenarios, to train officers when it is proper to shoot and when it is not. The City's training in this area is limited to the use of simulation machines, which, according to the Plaintiff's expert, is not in keeping with accepted practices and standards. Further, the City keeps no record on the simulation training and thus does not know whether Melvin received this training or how well he did. Without this critical information, the City, according to the Plaintiff's expert, is unable to show that its training is adequate. Again, the new Chief of Police recently has confirmed that adequate training should include both live "shoot/no shoot" scenarios and situational training as part of the use of force training.

To that general evidence, the Plaintiff offered testimony tending to show that the City did not provide adequate training on arrest procedures implicating the use of deadly force. For

22

instance, all of the police officers who were deposed in this case said they did not receive any post-Academy training on arrest and the use of force.  And, several officers were unaware of the City's putative policy of the use of force.

Through her expert witness, the Plaintiff also offered evidence about four key areas of arrest procedure that are lacking in the City's training program.  In each instance, the expert will opine that the deficiency offends general standards or practices.

First, the expert opined that Richmond police officers are inappropriately trained on how to respond to suspects who put their hands in their pockets.  The expert noted that there is a standard police practice, which has been given to Richmond police officers by an FBI agent, and which calls for the officer to instruct the suspect to keep his hands in his pocket until they can be safely removed upon arrest.  Instead of following that procedure, the City teaches its officers to instruct suspects to remove their hands immediately, which, according to the expert, increases the likelihood that force must be used.

Second, the expert opined that the City fails adequately to train its officers in the use of cover and lighting, which also increases the likelihood of the use of force.  The Academy provides training on these issues, but there is no evidence of training on

23

lighting in nighttime operations or any post-Academy training on the use of cover.

Third, the expert opined that the City fails adequately to train its officers on how to handle high-risk operations. The City has training on "raids," but only requires this training for officers who execute search warrants, and not for officers who serve arrest warrants at a suspect's home. Melvin, for example, did not receive this training until after Johnson's death.

Fourth, the expert opined that the City fails adequately to train specialized units like the Task Force in high-risk situations. While City policy requires that "specialized units" receive training on high-risk situations that the unit is likely to encounter, this Task Force received no such training, although it was labeled a "specialized unit."

The evidence offered by the Plaintiff concerning the deficiencies in the City's training program, particularly with respect to use of force, is disputed by the City and its expert. However, a reasonable jury could conclude that the City acted with deliberate indifference as to adequate training in the use of force, which is an essential part of any training program.

**4.   Causation**

The third component a failure to train claim is that the failure to train caused the constitutional violation. At the

24

summary judgment stage, "a Section 1983 plaintiff must offer sufficient evidence to support a finding that an 'affirmative causal link' exists between the alleged custom or policy and the complained of injury." <u>Brown v. Mitchell</u>, 327 F. Supp. 2d at 636 (quoting <u>Carter v. Morris</u>, 164 F.3d at 221). The Fourth Circuit has held that, in failure to train cases "failure to correct the known practice must be such as to make the specific violation 'almost bound to happen, sooner or later,' rather than merely 'likely to happen in the long run.'" <u>Spell v. McDaniel</u>, 824 F.2d at 1391.

The evidence adduced by the Plaintiff about the specific deficiencies in the City's training program could lead a reasonable juror to conclude the failure to correct these deficiencies made an incident like the Johnson shooting "bound to happen, sooner or later." Indeed, that is a principal reason that failure properly to train officers in the use of force is one of those "narrow circumstances" in which municipal liability can be found even in the absence of a pattern of alleged violations. On this record, a reasonable jury could conclude that the failure to train officers in the use of lethal force caused the violation here at issue.

**B.    The Alleged Failure to Respond to the Pattern of Excessive Use of Force Episodes**

The contention that the City has failed to respond to the pattern of unlawful use of force is one of the three assertedly

25

interrelated bases of municipal liability.   The contention is offered to show deliberate indifference in the failure to train claim.   Also, this theory is asserted as an independent ground of liability under the line of authority that, notwithstanding adequate training, police officers "may fall into patterns of unconstitutional conduct in their encounters with suspects [and] arrestees," which can give rise to liability if the pattern is widespread and the City fails to stop it or fails to adopt adequate measures to address complaints of excessive use of force.[10]

Whether considered as an independent basis of liability or as part of the "three interrelated bases" of liability, this theory depends at its core on the existence of proof of a pattern of unconstitutional use of deadly force.   As explained above, the record here does not support the existence of a pattern of such conduct.   Hence, this base of liability is unavailable as a matter of law.

## C.   The Appointment of Melvin to the Task Force

The third leg of the tripartate "interrelated bases" of liability is that the City erred in appointing Melvin to head the Task Force.   To support this theory, the Plaintiff relies on

---

[10]  Plaintiff's Opening Br. at 23-36, relying on <u>Spell v. McDaniel</u>, 824 F.2d 1380, 1390 (4th Cir. 1987) and <u>Cruz v. Bd. of Supervisors</u>, No. 91-1547, 1993 U.S. App. Lexis 1987 at *5 (4th Cir. January 7, 1993).

McQurter v. City of Atlanta, 572 F. Supp. 1401, 1421 (N.D. Ga. 1983), appeal dismissed, 724 F.2d 881 (11th Cir. 1984), abrogated on other grounds, 486 U.S. 196 (1988).  Neither that decision, nor its operative precepts, have become the law in this circuit.  Moreover, McQurter relied on a standard of municipal conduct that is no longer viable.

In any event, even if it could be held that deliberate indifference could be found in Melvin's appointment to head the Task Force, the failure to train claim would fail (on this theory) because the record does not show how the appointment of Melvin to head the Task Force caused Melvin to shoot Johnson.

The mere fact that Melvin, like all other Richmond police officers, may not be adequately trained in the use of force does not equate to the absence of qualifications to head the Task Force.  Yet, that is the factual premise for this part of the Plaintiff's "three interrelated bases" of municipal liability in Count IV.

Moreover, it may be true, as the Plaintiff contends, that Melvin would not have shot Johnson if Melvin was not on the Task Force.  However, even if that is so, it is not proof that Melvin's assignment to head the Task Force caused Melvin to shoot Johnson.  And, nothing else in the record supplies that causal link.

27

**CONCLUSION**

For the foregoing reasons, the Plaintiff has established the existence of genuinely disputed material facts which, if resolved in the Plaintiff's favor, would permit a jury to impose liability on the City under Count IV for failing to train its police officers in the use of lethal force when making arrests.  Hence, on that aspect of the claim, summary judgment will be denied.  However, for the reasons set forth above, the City is entitled to summary judgment on the Plaintiff's other two "interrelated bases" for the municipal liability urged in Count IV.

Hence, the City of Richmond's Motion for Summary Judgment (Docket No. 75) will be granted in part and denied in part.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record by facsimile and regular mail.

It is so ORDERED.

_____/s/_____
Robert E. Payne
United States District Judge


Richmond, Virginia
Date:_____